**Affirmed and Opinion filed January 23, 2014.**



**In the**

**Fourteenth Court of Appeals**

---

**NO. 14-12-01157-CV**

---

**CITY OF HOUSTON AND DANIEL W. KRUEGER, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF PUBLIC WORKS AND ENGINEERING DEPARTMENT, Appellants**

**v.**

**LITTLE NELL APARTMENTS, L.P., ET AL., Appellees**

---

**On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 2012-09885**

---

**O P I N I O N**

Appellants, the City of Houston (the "City") and Daniel W. Krueger, in his official capacity as Director of Public Works and Engineering Department, present this accelerated appeal from the trial court's order partially denying their plea to the jurisdiction based on governmental immunity in a declaratory judgment action brought by appellees, Little Nell Apartments, LP ("Little Nell"), HFI Regency

Park Apartments, LP ("Regency"), and Windshire Apartments, LP ("Windshire") (collectively, the "Apartments"). After an evidentiary hearing, the trial court sustained in part and denied in part the City and Krueger's plea to the jurisdiction, denying the plea only as to the Apartments' request for a declaratory judgment that Krueger in his official capacity acted in an ultra vires manner by subjecting their properties to drainage fees pursuant to chapter 47, article XIV, of the City's Code of Ordinances. After concluding that we have appellate jurisdiction, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In April 2011, the City enacted Ordinance No. 2011-254, hereinafter referred to as the "drainage fee ordinance." *See* Houston, Tex., Code of Ordinances, ch. 47, art. XIV ("Code of Ordinances"). The drainage fee ordinance created a municipal drainage utility, a public utility, "[i]n the interest of public health and safety and a more efficient and economic operation of drainage facilities of the city." Code of Ordinances, § 47-803. Under the drainage fee ordinance, the City shall "establish a schedule of drainage charges against all real property in the city subject to such charges"; provide drainage "for all real property in the city on payment of drainage charges unless the property is exempt from such payment"; and "offer drainage service on nondiscriminatory, reasonable and equitable terms." *Id.* § 47-801. The drainage charges are imposed "[t]o recover the city's cost of service to provide drainage to benefitted properties" and are to be used exclusively for various expenses "associated with the cost of service to provide drainage services within the service area." *Id.* §§ 47-821, 47-822(a). Drainage charges are calculated based on the specified rate (either residential or non-residential, and if residential, whether curb-and-gutter or open-ditch) per "square foot of impervious surface of a benefitted property." *Id.* § 47-822(b), (c). The drainage fee ordinance provides for various categories of exemptions from the imposition of a drainage

2

charge. *Id.* § 47-822(f). The director of the City's department of public works and engineering "shall be responsible for the administration of this article [XIV. Municipal Drainage Utility System]." *Id.* § 47-805. The drainage fee ordinance provides that the director "shall establish and implement a system of verification and correction of drainage charges for each property subject to the drainage charges." *Id.* § 47-824(a).

In May 2011, the Apartments received notice of proposed drainage charges that Krueger had determined for each of the Apartments based on each property's impervious square footage. The Apartments submitted requests for verification and correction of their initial drainage charges, specifically indicating that each property's drainage system was not part of the City's drainage system and therefore should be exempt from the drainage charges. *See id.* § 47-824(b). After these requests were denied, the Apartments requested an appeal. *See id.* § 47-824(e). These appeals resulted in a downward adjustment of the amount of Regency's impervious square footage, but did not change Little Nell's and Windshire's noticed amounts.[1]

In February 2012, the Apartments sued both the City and Krueger in his official capacity. The Apartments sought declarations with respect to whether they were "benefitted properties" under the ordinance, or alternatively, whether they were exempt from drainage charges under section 47-822(f)(2) of the ordinance, and sought recovery for drainage charges that they already paid. The City and Krueger filed a plea to the jurisdiction based on governmental immunity. The Apartments amended their petition to drop their claims for a refund of fees, and to specifically seek a declaration that the drainage fee ordinance is invalid and assert

---

[1] Krueger's determinations as to the area of impervious surface and amount of drainage charges are not at issue in this appeal.

3

ultra vires claims against Krueger based upon his failure to follow the ordinance. The City and Krueger filed an amended plea to the jurisdiction and a supplement to their amended plea. The Apartments responded in opposition.

The trial court held an evidentiary hearing. Carol Haddock, a senior assistant director in the City's public works and engineering department, and Carl Smitha, the city engineer, testified on behalf of the City and Krueger. David Brown, former chief drainage engineer for the City and former assistant director over design and construction for the Harris County Flood Control District ("HCFCD"), currently in private engineering practice, is the engineer of record for the development of the three properties at issue and testified on behalf of the Apartments.

At the conclusion of the hearing on December 12, 2012, the trial court provided its oral ruling denying in part and sustaining in part the City and Krueger's plea. The City filed its notice of appeal that same day. On January 11, 2013, the trial court signed its written order denying the amended plea and supplement as to the Apartments' request for a declaratory judgment that Krueger, in his official capacity, acted in an ultra vires manner by subjecting their properties to drainage fees pursuant to the drainage fee ordinance, and otherwise sustaining the plea. The trial court indicated that its denial was "due and restricted to the particular jurisdictional facts associated with the [Apartments'] specific locations and drainage at issue in this suit." The City filed an amended notice to appeal that same day "to provide the written order." The City and Krueger filed a second amended notice of appeal on March 27, 2013.

4

## II.  JURISDICTION

We first review the threshold issue of our jurisdiction.  The Apartments argue that this court lacks jurisdiction to hear Krueger's appeal because he was not included as an appealing party on the City's notice of appeal filed on December 12, 2012, the day the trial court made its oral ruling, deemed filed as of January 11, 2013; he was not included as an appealing party on the City's amended notice of appeal filed on January 11, 2013, "to provide the [court's] written order"; and he was first included as an appealing party on a second amended notice of appeal filed by both the City and Krueger on March 27, 2013.[2]  The Apartments contend that Krueger's delay proves fatal to his appeal.  We disagree.

Rule of Appellate Procedure 25.1 states that "[a]n appeal is perfected when a written notice of appeal is filed with the trial court clerk."  Tex R. App. P. 25.1(a). The rule contemplates that there might be a defect or that information might be omitted, and specifically authorizes a party to file an amendment "to correct[] a defect or omission in an earlier filed notice."  *Id.* 25.1(g).  When a notice of appeal fails to "state that the party desires to appeal" and to "state the name of each party filing the notice," it is defective.  *Kim v. Scarborough*, No. 14-04-00262-CV, 2004 WL 1574598, at *1 (Tex. App.—Houston [14th Dist.] July 15, 2004, no pet.) (mem. op.) (per curiam) (citing Tex. R. App. P. 25.1(d)(3),(5)).

The Texas Supreme Court "has consistently held that a timely filed document, even if defective, invokes the court of appeals' jurisdiction."  *Sweed v. Nye*, 323 S.W.3d 873, 875 (Tex. 2010) (per curiam) (gathering cases).  The Texas Supreme Court also has explained that its "consistent policy has been to apply

---

[2] In their response brief, the Apartments requested that this court strike the City and Krueger's second amended notice of appeal for cause per rule 25.1(g), and that this court consider their brief to include a motion to dismiss for lack of appellate jurisdiction.

rules of procedure liberally to reach the merits of the appeal whenever possible." *Warwick Towers Council of Co-Owners ex rel. St. Paul Fire & Marine Ins. Co. v. Park Warwick, L.P.*, 244 S.W.3d 838, 839 (Tex. 2008) (per curiam) (gathering cases).

Moreover, "a court of appeals has jurisdiction over an appeal when the appellant *files* an instrument that is 'a bona fide attempt to invoke appellate court jurisdiction.'" *City of San Antonio v. Rodriguez*, 828 S.W.2d 417, 418 (Tex. 1992) (per curiam) (citing *Grand Prairie Indep. Sch. Dist. v. S. Parts Imports, Inc.*, 813 S.W.2d 499, 500 (Tex. 1991) (per curiam)). Thus, appellate courts should allow an opportunity to amend a defective instrument before dismissal. *Kim*, 2004 WL 1574598, at *1 (describing issuance of court order allowing amendment of notice of appeal). Examples where the Texas Supreme Court has concluded that a bona fide attempt was made to invoke the appellate court's jurisdiction include: where the notice of appeal was filed by the insurer instead of the insured,[3] where a party filed a notice of appeal in the alternative as part of a motion for new trial,[4] where a party filed one "instrument" in an attempt to appeal two probate orders,[5] where a party filed a notice of appeal with the wrong cause number,[6] and where a party filed a notice of appeal five and a half months after his claim was dismissed and then amended that notice after the six-month mark to include information required for a restricted appeal.[7]

The City and Krueger assert that their attorneys meant to appeal the partial denial of the plea to the jurisdiction on behalf of both the City and Krueger. They

---

[3] *Warwick Towers*, 244 S.W.3d at 839–40.

[4] *In re J.M.*, 396 S.W.3d 528, 531 (Tex. 2013) (per curiam).

[5] *Maxfield v. Terry*, 888 S.W.2d 809, 811 (Tex. 1994) (per curiam).

[6] *Rodriguez*, 828 S.W.2d at 418.

[7] *Sweed*, 323 S.W.3d at 874–75.

acknowledge their attorneys made a mistake by only filing on the City's behalf, but they amended the notice of appeal before filing their joint appellate brief. *See* Tex. R. App. P. 25.1(g) ("An amended notice of appeal correcting a defect or omission in an earlier filed notice may be filed in the appellate court at any time before the appellant's brief is filed."). The Apartments acknowledge that the City's notice of appeal from the denial of its and Krueger's plea to the jurisdiction was timely. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (West 2011); Tex. R. App. P. 26.1(b) & 28.1(b). The Apartments acknowledge that the City is a "necessary party to the case because the Court will be required to construe the City's ordinances in determining whether Krueger had the authority to assess the Apartments with the drainage fees." *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 634 (Tex. 2010). The Apartments also acknowledge that the trial court's order, which denied the plea to the jurisdiction as to the Apartments' request for a declaratory judgment that Krueger "acted in an ultra vires manner by subjecting the properties . . . with drainage fees," was attached to the City's first amended notice of appeal.

Nevertheless, the Apartments contend that there was no bona fide attempt by Krueger to appeal. However, all the cases they cited are distinguishable either because there was no timely notice of appeal filed whatsoever,[8] the notice of appeal was not timely as to the particular order sought to be appealed,[9] the party who did file a timely notice of appeal lacked standing,[10] or the court failed to

---

[8] *See Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 564 (Tex. 2005); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737–38 (Tex. 2001); *Harris Cty. v. Norris*, 240 S.W.3d 255, 261 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

[9] *See Rainbow Group, Ltd. v. Wagoner*, 219 S.W.3d 485, 492 (Tex. App.—Austin 2007, no pet.).

[10] *See Bahar v. Baumann*, No. 03-09-00691-CV, 2011 WL 4424294, at *2 (Tex. App.—Austin Sept. 23, 2011, pet. denied) (mem. op.).

address whether there was a bona fide attempt to invoke appellate jurisdiction.[11] Moreover, the Apartments have not argued that they were misled or disadvantaged in any way by the defective notice here. *See Rodriguez*, 828 S.W.2d at 418.

In light of the consistent holdings of the Texas Supreme Court, its policy to apply the rules of procedure liberally in favor of appellate review, and the circumstances of this case, we therefore conclude that we have jurisdiction to hear Krueger's appeal.

## III. ANALYSIS

The parties acknowledge that the sole issue on appeal is whether the trial court erred in denying the City and Krueger's plea to the jurisdiction as to the ultra vires claims alleged against Krueger by the Apartments. The City and Krueger argue both the face of the Apartments' pleadings and the jurisdictional evidence confirm that the alleged ultra vires claims are barred by governmental immunity. We conclude that the trial court did not err.

## A. Standard of review

If a governmental unit has immunity from a pending claim, a trial court lacks subject matter jurisdiction as to that claim. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012). A challenge to a trial court's subject matter jurisdiction may be asserted by a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). We review a trial court's ruling on a plea to the jurisdiction de novo. *Id.* at 228. In a plea to the jurisdiction, a party may challenge the pleadings, the existence of jurisdictional facts, or both. *Id.* at 226–27.

---

[11] *See Crofton v. Amoco Chem. Co.*, No. 01-01-00526-CV, 2003 WL 21297588, at *3 (Tex. App.—Houston [1st Dist.] May 30, 2003, pet. denied) (mem. op.).

When a plea to the jurisdiction challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating the court's jurisdiction. *Id.* at 226 (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). "We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate jurisdiction but do not reveal incurable defects, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. *Id.* at 226–27. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id.* at 227.

Where the governmental unit challenges the existence of jurisdictional facts, and the parties submit evidence relevant to the jurisdictional challenge, we consider that evidence when necessary to resolve the jurisdictional issues raised. *Id.* at 227; *Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 369 (Tex. App.—Houston [14th Dist.] 2013, pet. filed). The standard of review for a jurisdictional plea based on evidence "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Miranda*, 133 S.W.3d at 228. Under this standard, when reviewing a plea in which the pleading requirement has been met, we credit as true all evidence favoring the nonmovant and draw all reasonable inferences and resolve any doubts in the nonmovant's favor. *Id.* The movant must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction. *Id.* Proof is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant discharges this burden, the nonmovant must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained.

9

*Miranda*, 133 S.W.3d at 228.

Thus, once and if the Apartments have met their pleading requirement, as the movants, the City and Krueger have the burden to establish their entitlement to governmental immunity. *See id.* If the evidence raises a fact issue as to jurisdiction, their plea must be denied because the issue must be resolved by the trier of fact. *See id.* at 227–28. If the relevant evidence is undisputed or fails to present a jurisdictional fact issue, however, the court should rule on the plea as a matter of law. *Id.*

## B. Ultra vires claims

The Apartments have attempted to plead ultra vires claims against Krueger in his official capacity, alleging that Krueger is acting outside of his authority under the drainage fee ordinance by imposing drainage charges on the Apartments' properties. They contend that Krueger exceeded his authority because their developed properties are not "benefitted properties," and because they are exempt from drainage charges since they are "served exclusively by a properly constructed and maintained wholly sufficient and privately owned drainage system." The City and Krueger argue that the Apartments merely complain of Krueger's exercise of authority and discretion, which he did not exceed, and therefore their claims are barred by immunity.

A suit asserting that a government officer acted without legal authority or seeking to compel him to comply with statutory or constitutional provisions is an ultra vires suit and is not subject to pleas of governmental immunity. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 371–72 (Tex. 2009). Such a suit, in effect, does not seek to alter government policy; it seeks to reassert the control of and enforce existing policy of the governmental entity. *Id.* at 372. Because these suits are not considered to be suits against the governmental entity, they must be

10

brought against the allegedly responsible government actors in their official capacities, as the Apartments have done here against Krueger. *See id.* at 373. To fall within the ultra vires exception to governmental immunity, a plaintiff may not complain about a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act. *Id.* at 372. The exception permits only prospective declaratory or injunctive relief restraining ultra vires conduct, as opposed to retroactive relief. *Id.* at 374–77 (explaining that although governmental immunity does not bar such ultra vires claims, because suit is against the governmental unit for all practical purposes, its remedies must be limited).

The parties agree that this court will need to construe the ordinance in our review of the trial court's ruling in order to determine whether the facts as pleaded demonstrate the ultra vires nature of Krueger's alleged actions. If we conclude that the pleadings do not affirmatively negate jurisdiction, then we will determine whether the evidence raises a fact issue as to jurisdiction.

## C. The director's authority and discretion under the drainage fee ordinance

The City and Krueger insist that the drainage fee ordinance necessarily grants Krueger the authority and discretion to assess drainage charges on the Apartments' properties after making the threshold determination as to whether the property is within the "service area" as defined in the ordinance, and after making the determination as to whether the property falls within any of specified exemptions from such charges. The Apartments acknowledge that the drainage fee ordinance confers authority and some discretion upon Krueger to determine the amount of the fee and the methodology employed in the calculation of the impervious service on a property subject to the fee. However, they argue that the issue presented in their ultra vires claims is whether a drainage charge can be

11

imposed on their properties at all. The Apartments contend nothing in the ordinance gives Krueger the authority or discretion to charge fees that are not otherwise authorized by the ordinance.

The same rules that govern statutory construction apply to the construction of municipal ordinances. *Seawall E. Townhomes Ass'n, Inc. v. City of Galveston*, 879 S.W.2d 363, 364 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing *Mills v. Brown*, 316 S.W.2d 720, 723 (Tex. 1958)). Our primary objective is to give effect to the enacting body's intent. *Id.*; *see TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). The most reliable expression of such intent is the literal text of the provision. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). We presume that the language of an ordinance was selected with care and that every word and phrase was used for a purpose. *See DeQueen*, 325 S.W.3d at 635. Where possible, we avoid treating any language as surplusage. *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). We construe an ordinance "according to what it says, not according to what we think it should have said." *City of San Antonio v. Hartman*, 201 S.W.3d 667, 673 (Tex. 2006). If an ordinance assigns a particular meaning to a term, courts are bound by the statutory usage. *See TGS–NOPEC*, 340 S.W.3d at 439.

The City and Krueger point to section 47-805 in support of Krueger's broad authority, which, according to them, "necessarily grants Krueger the authority and discretion to assess drainage charges on their properties after determining whether they are within the service area and not exempt." Section 47-805 provides:

> The director shall be responsible for the administration of this article [XIV. Municipal Drainage Utility System] including, but not limited to, enacting any procedures or policies necessary for the administration of the drainage system and the drainage charges,

12

developing maintenance and improvement programs, and establishing drainage criteria and standards for operation of the drainage system, in accordance with and subject to the provisions of this article. Calculation of impervious surface shall be adjusted by the director based on utilization of approved stormwater management techniques on the benefitted property. Any approved management techniques are to be identified and described in detail by the director and the information made readily available to the public.

Code of Ordinances, § 47-805. The drainage fee ordinance does not define administration, but the pertinent ordinary meaning of the word means "the act or process of administering," that is, "managing or supervising the execution, use, or conduct of," here, the municipal drainage utility system. Merriam-Webster's Collegiate Dictionary 16 (11th ed. 2003); *see TGS-NOPEC*, 340 S.W.3d at 439 (citing *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009)). The section then includes some examples of what the director is responsible for administering, such as "enacting policies and procedures necessary for the administration of the drainage system and the drainage charges, developing maintenance and improvement programs, and establishing drainage criteria and standards for operation of the drainage system." Code of Ordinances, § 47-805. The director also is expressly charged with adjusting the calculation of impervious surface "based on utilization of approved stormwater management techniques on the benefitted property," and identifying, describing, and making information about approved stormwater management techniques available to the public. *Id.*

This section thus confers authority on the director to reasonably fulfill his duty of administering the municipal drainage utility system "in accordance with and subject to the provisions of this article." *See id.* But essentially the Apartments' position is that the director's actions in assessing their properties drainage charges in fact fall wholly outside the scope and authority of such

13

administrative responsibility because their properties are not "benefitted properties" or are exempt from drainage charges under section 47-822(f)(2).

To determine whether the Apartments have pleaded permissible ultra vires claims, we focus on whether those claims have been "brought against a state official for nondiscretionary acts unauthorized by law." *Tex. Dept. of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011) (per curiam). To determine the contours of the director's authority and discretion, we examine the enacting body's words in the context of the drainage fee ordinance as a whole and do not consider words or parts of the ordinance merely in isolation. *See DeQueen*, 325 S.W.3d at 636.

Under the drainage fee ordinance, the City "shall establish a schedule of drainage charges against all real property in the city subject to such charges under this article." Code of Ordinances, § 47-801(1). The City "shall provide drainage for all real property in the city on payment of drainage charges unless the property is exempt from such payment." *Id.* § 47-801(2). And the City "shall offer drainage service on nondiscriminatory, reasonable and equitable terms." *Id.* § 47-801(3). With regard to which properties are subject to drainage charges, section 47-822(a) provides:

> To recover the city's cost of service to provide drainage to benefitted properties, annual drainage charges calculated as provided herein are hereby imposed on all parcels of real property within the drainage service area for which drainage service is made available under this article, save and except for those properties exempted from the payment of drainage charges as provided herein.

*Id.* § 47-822(a). Thus, the expressed purpose of the drainage charge is to recover the cost of service associated with providing drainage to "benefitted properties." *Id.* The ordinance defines a "benefitted property" as:

> a lot or tract to which drainage service is made available under this

14

article and which discharges into a street, creek, river, slough, bayou, culvert, conduit, inlet, or other channel that forms part of the city drainage utility system.

*Id.* § 47-802. Thus, to fall within the category of benefitted property, drainage service must be made available to the property at issue and that property must discharge into a "part of the city drainage utility system." *Id.* The ordinance provides that "cost of service":

> as applied to the drainage service for any benefitted property, means but shall not be limited to, the prorated cost of the following:
>
> (1) The acquisition of interests in real property relating to drainage structures, equipment and facilities;
>
> (2) The acquisition, construction, repair, and maintenance of drainage structures, equipment, and facilities;
>
> (3) The acquisition of drainage-related architectural, engineering, legal, and related services, plans and specifications, studies, surveys, estimates of cost and of revenue, and all other expenses necessary or incident to planning, providing, or determining the feasibility and practicality of drainage structures, equipment and facilities;
>
> (4) Providing and operating all drainage-related machinery, equipment, furniture, and facilities;
>
> (5) Start-up costs of drainage facilities; and
>
> (6) Administrative costs including bank fees.

*Id.* The "cost of service" thus applies to "the drainage service for any benefitted property," which includes costs for acquiring real property interests, constructing and maintaining drainage equipment and facilities, and operating drainage-related equipment and facilities. *Id.* The ordinance defines "drainage" as:

> streets, curbs, bridges, catch basins, channels, conduits, creeks, culverts, detention ponds, ditches, draws, flumes, pipes, pumps, sloughs, treatment works, and appurtenances to those items, whether natural or artificial, or using force or gravity, that are used to draw off surface water from land, carry the water away, collect, store, or treat

15

the water, or divert the water into natural or artificial watercourses; drainage shall also mean the water so transported.

*Id.* "Drainage system" is defined as:

the drainage owned or controlled in whole or in part by the city and dedicated to the service of benefitted property, including provisions for additions to the system. Drainage system components, including but not limited to streets, sidewalks, other dedicated improvements, and supporting right-of-way shall not be considered residential or nonresidential property as defined herein.

*Id.* Thus, to be part of the "drainage system," the drainage must be "owned or controlled in whole or in part by the city and dedicated to the service of benefitted property." *Id.* The ordinance defines "public utility" as:

drainage service that is regularly provided by the city through municipal property dedicated to providing such service to the users of benefitted property within the service area, and that is based on an established schedule of charges, the use of police power to implement the service, and nondiscriminatory, reasonable, and equitable terms as provided under this article.

*Id.* The ordinance defines the "drainage service area" as "the corporate limits of the City of Houston, as those corporate limits are altered from time to time in accordance with state law and the Charter and ordinances of the city." *Id.*

The drainage charge is to be imposed on "all parcels of real property within the drainage service area for which drainage service is made available under this article, save and except for those properties exempted from the payment of drainage charges as provided herein." *Id.* § 47-822(a). "Drainage charge" is defined as "the charge imposed by the city herein, including penalties, to recover the city's cost in furnishing drainage for any benefitted property and the cost of funding future drainage system improvements." *Id.* § 47-802. Section 47-822(f)

16

provides for various exemptions. *Id.* § 47-822(f). Properties falling within any of these categories "are exempt from imposition of a drainage charge." *Id.* The exemption at issue here is "[p]roperties served exclusively by a properly constructed and maintained wholly sufficient and privately owned drainage system." *Id.* § 47-822(f)(2); *see also id.* § 47-822(f)(1), (3)–(7) (other exemptions are for agricultural use property, state agencies, institutions of higher education, property owned by school districts as of a certain date, tax-exempt property owned by religious organizations, and county-exempt property). The ordinance defines a "wholly sufficient and privately owned drainage system" as "land owned and operated by a person or entity other than the city's drainage utility system, the drainage of which does not discharge into a street, ditch, culvert, creek, river, slough, or other channel that is a part of the city's drainage system." *Id.* § 47-802.

The Apartments contend Krueger's charging drainage fees to properties that are not "benefitted properties" or that fall within the "wholly sufficient and privately owned drainage system" exemption would not be authorized by the drainage fee ordinance. The City and Krueger insist that the Apartments merely complain of Krueger's exercise of authority and discretion granted to him under the ordinance to assess drainage charges on their properties after determining that they are within the service area and not exempt. The City and Krueger argue that the ordinance utilizes the term "benefitted property" in a "global sense" to refer to all developed property in the service area, and thus all property presumptively is "benefitted property" subject to drainage charges. The City and Krueger also argue that "as a matter of law, all property within the service area discharges into the 'drainage system' because that term is defined in an integrated holistic manner to include all natural and artificial means or components for drawing off surface runoff or storm water either directly or indirectly—including the water itself." The

17

City and Krueger further contend the Apartments cannot complain that Krueger "got it wrong" in an ultra vires suit.[12] We conclude that the plain language of the ordinance does not support the City and Krueger's position.

The drainage fee ordinance provides a specific definition for "benefitted property." *Id.*[13] This express definition does not state that "benefitted property" is all property within the City, or within the service area, but rather that it is property to which drainage service is made available and which discharges into a part of the city drainage utility system. *See id.* Nor does the plain language of the definition of "drainage system" support the City and Krueger's claim that all property in the service area presumptively discharges into the requisite "drainage system." While the components of the drainage system are not limited in type and include "streets, sidewalks, other dedicated improvements, and supporting right[s]-of-way," there is an express limitation in that such drainage must be "owned or controlled in whole or part by the city." *Id.* The drainage within the drainage system also must be "dedicated to the service of benefitted property." *Id.* This usage is consistent with

---

[12] We note that the City and Krueger's position as to this argument is inconsistent at best. At the evidentiary hearing, counsel for the City and Krueger stated: "If [Krueger] imposed a fee on a piece of property that is not subject to the fee, then that would be an ultra vires act." When further asked by the trial court whether it had jurisdiction in a case where Krueger "makes a mistake" as to whether a property is subject to a fee, counsel for the City and Krueger agreed. Moreover, the federal cases cited by the City and Krueger do not support their position. To the extent we would even consider immunity as applied in federal law, the statutes at issue provided authority for the official to perform the challenged action. *Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1234 (9th Cir. 1982) (EPA administrator had authority to issue "a finding of violation" "on the basis of any information available to him" under 33 U.S.C. § 1319(a)(1)); *Gardner v. Harris*, 391 F.2d 885, 888 (5th Cir. 1968) ("No limits on this authority are cited to us, either by the Government or by the Court below, as long as it is reasonably connected with the administration of the [Natchez] Trace." (footnote omitted)).

[13] This definition generally mirrors the definition of "benefitted property" provided in subchapter C of chapter 552 of the Texas Local Government Code (the "Municipal Drainage Utility Systems Act" or "MDUSA"). *See* Tex. Local Gov't Code § 552.044(1)(B). The municipal drainage utility system under the drainage fee ordinance was created in accordance with the MDUSA. Code of Ordinances, § 47-803.

the ordinance's definition of "public utility," which provides "utility" drainage service is such that is "regularly provided by the city through municipal property dedicated to providing such service to the users of benefitted property within the service area." *Id.* Further, the phrase "for which drainage service is made available" used within section 47-822(a) on drainage charges qualifies which properties within the service area are to have charges imposed on them, and such usage is consistent with the phrase "to which drainage service is made available" included within the definition of "benefitted property." *Id.* §§ 47-802, 47-822(a). Thus, we cannot agree with the City and Krueger that the facts relating to any particular property—whether drainage service is made available to it and whether it discharges into the city drainage utility system—are immaterial to its status as a "benefitted property."

Not only does the ordinance assign a particular and binding definition to the term "benefitted property," *see TGS–NOPEC*, 340 S.W.3d at 439, but also the ordinance consistently qualifies that drainage charges are only to be imposed where drainage is provided to "benefitted properties." For example, the expressed purpose of the drainage charge is "[t]o recover the city's cost of service to provide drainage to benefitted properties" and, as such, the rates and calculations of drainage charges are provided for each "benefitted property." Code of Ordinances, § 47-822(a), (b), (c). Drainage charges are imposed "to recover the city's cost of furnishing drainage for any benefitted property." *Id.* § 47-802. The area of impervious surface "on each benefitted property" shall be determined based on digital map data from the tax assessment rolls or other similar reliable data as determined by the director. *Id.* § 47-822(d). The cost of service applies to "any benefitted property." *Id.* § 47-802. Users, which are defined as "person[s] or entit[ies] who own[] or occup[y] a benefitted property," *id.*, can request

19

verification and correction of, and attempt to appeal, initial drainage charges "imposed on a benefitted property," *id.* § 47-824. Further, the defined term "benefitted property" is utilized within seven other defined terms—including "cost of service," "drainage charge, "drainage system," "public utility" and "user"—in the ordinance. *Id.* § 47-802. We conclude that the enacting body would not have particularly defined "benefitted property" and consistently used it in the context of qualifying the drainage charges to be imposed under the ordinance if what it actually intended was that all real property in the City or "service area" presumptively was to be assessed charges. To conclude otherwise would involve impermissibly treating the term "benefitted property" as surplusage. *See Spradlin*, 34 S.W.3d at 580.

We thus conclude that, under the plain language of the drainage fee ordinance, a property must be a "benefitted property" to be subjected to drainage charges.[14] Also, the parties apparently do not disagree that, under the plain language of the ordinance, if a property falls within one of the specified categories of exemption, including being exclusively served by a "wholly sufficient and privately owned drainage system," it is not to be subjected to drainage charges. But we acknowledge these are slightly different questions than whether the director has the authority, and the discretion, to impose drainage charges on a property that is not a "benefitted property" under the ordinance or that is otherwise not subject to drainage charges under the "wholly sufficient and privately owned drainage system" exemption, such that he would not be subject to ultra vires claims here.

Beyond the general responsibility to administer the municipal drainage utility system, Code of Ordinances, § 47-805, the ordinance provides specific

_____

[14] We do not find persuasive the City and Krueger's cited cases related to other states' "similar statutes." There, the central issue was whether the utility charge imposed amounted to an impermissible tax or a valid special assessment. That particular issue is not before us.

authority with regard to the calculation and adjustment of impervious surface on "benefitted properties" based on approved stormwater management techniques, *id.*; the determination of the area of impervious surface "on each benefitted property" based on digital map data from tax plats and assessment rolls or other similar, reliable data, *id.* § 47-822(d); the review and adjustment of the amount of impervious surface and drainage charges "for benefitted property," *id.* § 47-823; the system of verification and correction for properties subject to drainage fees, *id.* § 47-824(a); for appeals, the designation of independent hearing examiners to consider whether the drainage charge was correctly determined based on the amount of impervious surface, *id.* § 47-824(e); and the determination of the party responsible for drainage charges, *id.* § 47-843. However, none of these grants of authority specifically indicates that the director has authority to determine which properties are "benefitted properties" or subject to drainage charges because they do not meet an exemption.[15] Rather, the common thread of all these specifically authorized actions is that they apply and the director performs them only with regard to "benefitted properties," or to properties "subject to the drainage charges."

With regard to the specifically authorized actions, the drainage fee ordinance indicates which are subject to the director's discretion.[16] The director has discretion to approve stormwater management techniques, *id.* § 47-805; to decide

---

[15] Although the City and Krueger acknowledge this in their reply brief, they argue that the authority to decide "whether a property is benefitted" and "whether properties have created a sufficient private drainage system to qualify for an exception" is "implied as a natural outgrowth of the ordinance." However, their cited case, *Pruett v. Harris County Bail Bond Board*, is distinguishable because the statute at issue expressly conferred on the board as an administrative agency the authority to "regulate" the bail bonding business. 249 S.W.3d 447, 452–53 (Tex. 2008) ("When a statute expressly authorizes an agency to regulate an industry, it implies the authority to promulgate rules and regulations necessary to accomplish that purpose.").

[16] Within the context of official immunity, the Texas Supreme Court has explained: "If an action involves personal deliberation, decision and judgment, it is discretionary; actions which require obedience to orders or the performance of a duty to which the actor has no choice, are ministerial." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994).

21

what constitutes "other similar reliable data" for purposes of determining area of impervious surface, *id.* § 47-822(d); to "where appropriate" adjust the calculation of impervious square footage to determine drainage charges, *id.* § 47-823; with regard to establishing and implementing the system for verification and correction of drainage charges, *id.* § 47-824(a); with regard to establishing the independent process for appealing verification and correction results, subject to City council's approval, *id.* § 47-824(e); and, in circumstances of multiple users, when choosing which party is responsible for drainage charges, *id.* § 47-843. However, the ordinance does not contain any language indicating—even if the director has the authority to make the determinations—that he personally decides which properties are "benefitted" or otherwise exempt from drainage charges, such as under section 47-822(f)(2). The ordinance does not expressly provide the director with discretion to interpret the ordinance,[17] or to grant or deny exemptions.[18] Rather, the ordinance expressly defines "benefitted property" and provides a set list of mandatory exemptions, including one for properties exclusively served by "wholly sufficient and privately owned drainage systems." *Id.* §§ 47-802, 47-822(f); *see also id.* § 47-801(2) ("The city shall provide drainage . . . on payment of drainage charges unless the property is exempt from such payment as provided herein."); *id.* § 47-822(a) ("To recover the city's cost of service to provide drainage to benefitted properties, annual drainage charges calculated as provided herein are hereby

---

[17] The Apartments note that, unlike in *Klumb v. Houston Municipal Employees Pension System*, the drainage fee ordinance does not provide the director with discretion to interpret or supplement the ordinance. 405 S.W.3d 204, 218 (Tex. App.—Houston [1st Dist.] 2013, pet. filed) (providing that pension board may "interpret and construe" the statute at issue, and may also "correct any defect, *supply any omission*, and reconcile any inconsistency that appears in this Act in a manner and to the extent that the pension board considers expedient to administer this Act for the greatest benefit of all members").

[18] *Cf. Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 517 (Tex. App.—Austin 2010, no pet.) (legislature delegated express and exclusive authority to TCEQ to "grant or deny" expedited release petitions based on all relevant information submitted).

22

imposed . . . , save and except for those properties exempted from the payment of drainage charges as provided herein.").

Nor do the cases relied on by the City and Krueger in their brief persuade this court that the ordinance grants Krueger the discretion to perform the ultra vires act of imposing a drainage charge on a property that is not a "benefitted property" or the ultra vires act of imposing a drainage charge on a property that falls within the "wholly sufficient and privately owned drainage system" exemption, as alleged here.[19] *City of Lancaster v. Chambers* involved a police officer's discretionary actions while engaging in a high-speed chase. 883 S.W.2d 650, 655 (Tex. 1994) ("Beyond the initial decision to engage in the chase, a high speed pursuit involves the officer's discretion on a number of levels[.]"). In *McLane Co. v. Strayhorn*, the court concluded that sovereign immunity barred suit against the comptroller who refused a letter of credit as collateral for receiving cigarette tax stamps without prepayment because the language of the statute at issue "evidence[d] a clear grant of discretion" to the comptroller to determine whether such pledged collateral was "acceptable." 148 S.W.3d 644, 650 (Tex. App.—Austin 2004, pet. denied).

---

[19] The cases the City and Krueger cite in their reply brief also are distinguishable. *See Ahmed v. Texas Tech Univ. Health Sci. Ctr. Sch. of Med. at Amarillo*, No. 07-11-00176-CV, 2013 WL 265076, at *7 (Tex. App.—Amarillo Jan. 23, 2013, no pet.) (mem. op.) (supervisor's actions in providing unfavorable evaluation, opposing plaintiff's appeal of evaluation, cancelling plaintiff's teaching assignments, failing to include plaintiff in faculty retreats, meetings and dinners, failing to timely perform evaluations, and pressuring plaintiff to resign his position were discretionary); *Creedmoor-Maha Water Supply*, 307 S.W.3d at 517; *Merritt v. Cannon*, No. 03-10-00125-CV, 2010 WL 3377778, at *3 (Tex. App.—Austin Aug. 27, 2010, pet. denied) (mem. op.) (statutory scheme at issue expressly charged the Texas Department of Transportation with both administration and enforcement pertaining to regulation and permitting of outdoor signs on rural roads); *Appraisal Review Bd. of Harris Cty. Appraisal Dist. v. O'Connor & Assocs.*, 267 S.W.3d 413, 419 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding that plaintiffs were required to and had failed to exhaust their administrative remedies under the Tax Code, nor had plaintiffs pleaded review board acted wholly outside, just that it did not procedurally comply with, Tax Code provisions).

Here, while clear authority is provided for the director to take various discretionary actions with regard to "benefitted property" and property not subject to any exemption, the ordinance does not provide such a clear and unambiguous grant of authority, much less discretion, for the director to make the underlying determinations of whether a property constitutes "benefitted property" or falls within an exemption such as for properties served exclusively by "wholly sufficient and privately owned drainage systems." Further, the ordinance's consistent references to drainage charges as applying to "benefitted properties," and to property "subject to such charges" and "unless" and "save and except" exempt indicates the intent of the enacting body was that only "benefitted properties" subject to drainage charges, meaning those not falling within an exemption, even would have charges imposed on them. In other words, imposing drainage charges on a property not properly subject to charges—that is not a "benefitted property" or is a "benefitted property" but otherwise exempt because it is exclusively served by a "wholly sufficient and privately owned drainage system"—would involve acting without legal authority under the ordinance.

Construing the ordinance as a whole, and under the presumption that the enacting body chooses its wording with care, we conclude the director who imposes drainage charges on properties that do not properly meet the definition of "benefitted property" or that otherwise properly fall within the "wholly owned and privately owned drainage system" exemption has acted ultra vires—that is, he has failed to comply with or has acted without legal authority under the ordinance. We thus cannot agree with the City and Krueger that, if, as the Apartments have pleaded, their properties do not fit within the definition of "benefitted property" because the City does not own or control any part of the drainage system that is made available or dedicated to their properties or their properties otherwise fall

within the "wholly sufficient and privately owned drainage system" exemption, Krueger has the authority and discretion to choose to impose drainage charges on their properties. Therefore, construing the Apartments' pleadings liberally, we conclude that they have met their affirmative pleading requirement. *See Miranda*, 133 S.W.3d at 226.

## D. Whether the evidence conclusively shows a lack of jurisdiction

Next, we must determine whether the City and Krueger have presented conclusive proof that the Apartments' properties are "benefitted properties." We also must determine whether they have presented conclusive proof that the Apartments' properties are otherwise not subject to the exemption for a "wholly sufficient and privately owned drainage system." *See id.* at 228. Only if the evidence fails to raise a fact issue as to the Apartments' status as "benefitted properties," and also as not subject to the "wholly sufficient and privately owned drainage" fee exemption, then we should rule on and sustain the plea in its entirety as a matter of law. *See id.*

In our review of the trial court's decision to partially deny the plea to the jurisdiction, we take as true all evidence favorable to the Apartments and we keep in mind it is the City and Krueger's burden to negate any genuine issue of material fact as to jurisdiction, akin to review of a summary judgment. *See id.* We also keep in mind that although we must review evidence that implicates the merits as necessary to decide the jurisdictional question, the ultimate merits of the parties' controversy are not before us. *See id.* ("[B]y reserving for the fact finder the resolution of disputed jurisdictional facts that implicate the merits of the claim or defense, we preserve the parties' right to present the merits of their case at trial."); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) ("[T]he proper function of a dilatory plea does not authorize an inquiry so far into the substance of

the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction.").

### 1. Evidence as to whether the Apartments are "benefitted properties"[20]

We first consider whether the City and Krueger have conclusively negated any genuine fact issue as to whether the Apartments' properties are "benefitted properties." The City and Krueger insist that because the Apartments' properties have City addresses (Little Nell and Regency) or share a border with the City (Windshire), they are within the service area under the ordinance and thus are "benefitted properties" as a matter of law. However, as analyzed above, under the drainage fee ordinance, mere location is not enough to meet the definition of a "benefitted property." Instead, a "benefitted property" means "a lot or tract to which drainage service is made available under this article and which discharges into a street, creek, river, slough, bayou, culvert, conduit, inlet, or other channel that forms part of the city drainage utility system." Code of Ordinances, § 47-802.

With regard to whether drainage service is made available to the Apartments' properties and whether those properties discharge into "part of the city drainage utility system," we consider the language of the ordinance. "Drainage service" is not separately defined in the ordinance, but appears twice in the definitions section. First, the term appears within the definition of "cost of service"—"as applied to the drainage service for any benefitted property." *Id.* Second, within the definition of "public utility," meaning "drainage service that is regularly provided by the city through municipal property dedicated to providing

---

[20] We note that the parties provided little in the way of argument regarding the specific evidence put forth as to the jurisdictional facts. The City and Krueger primarily rely on their interpretation of the ordinance and the "MS4 permit." And the Apartments dispute that the facts implicate jurisdiction, as opposed to the merits, and then merely refer this court to their "exhaustive briefing submitted to the trial court."

such service to the users of benefitted property within the service area." *Id.* The ordinance also does not define the term "city utility drainage system," but does define "drainage system" to mean:

> the drainage owned or controlled in whole or in part by the city and dedicated to the service of benefitted property, including provisions for additions to the system. Drainage system components, including but not limited to streets, sidewalks, other dedicated improvements, and supporting right[s]-of-way shall not be considered residential or nonresidential property as defined herein.

*Id.* "Drainage system" also appears in the definition of "drainage charge": "the charge imposed by the city herein . . . to recover the city's cost in furnishing drainage for any benefitted property and the cost of funding future drainage system improvements." *Id.* Further, the ordinance expressly incorporates "[e]xisting City of Houston drainage facilities . . . into the drainage utility." *Id.* § 47-804.

Based on the plain language read in the context of the ordinance as a whole, it is clear that the drainage service made available to a property must be provided, at least partially, by the City. Likewise, in order for a property to discharge into the city drainage utility system, it is clear that the drainage at issue must be furnished, that is, owned or controlled at least partially by the City. At the least, the City and Krueger need to conclusively prove there is no genuine fact issue as to the partial ownership or control by the City of the drainage service allegedly made available to each of the Apartments' properties, and of the part of the city drainage utility system into which each of the Apartments' properties allegedly discharges. We conclude that they have not met their burden.

### a. Little Nell

#### 1) The City and Krueger's evidence

The City and Krueger point to testimony by Haddock and Smitha that

27

stormwater from Little Nell discharges into a flow pattern that includes Brays Bayou,[21] the Brays Bayou Detention Basin, and Mason Park, and ultimately flows to the Houston Ship Channel. They presented deeds purporting to show the transfers of the Brays Bayou detention facility property and the Mason Park property to the City. Haddock and Smitha also testified that the detention facility is owned by the City. Haddock further testified that the detention facility was built by the City, and HCFCD "agreed to the long-term maintenance." Smitha stated that HCFCD maintains the detention facility. The City and Krueger presented the City's Storm Water Management Program ("SWMP")—the document implementing the City's portion of the Municipal Separate Storm Sewer System permit, known as the "MS4 permit"[22]—which states that the City constructed and HCFCD maintains the Brays Bayou detention facility. They also presented the Memorandum of Understanding between the City and HCFCD, which states that the City owns and constructed the Brays Bayou Detention Basin, and HCFCD "assumed responsibility for maintenance."

2) The Apartments' evidence

According to Brown, the drainage for Little Nell is collected in an underground drainage system and then is discharged into an on-site detention facility. This flow is then metered and discharged into a HCFCD flood control

_____

[21] The State of Texas, except where title has been transferred, owns the soil underlying navigable streams. *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 386–87 (Tex. 2011) (citing Tex. Parks & Wild. Code § 1.011(c); Tex. Water Code § 11.021). Although not discussed in their respective briefs, in the trial court, the parties each relied on competing legislative pronouncements that they contended bore on State transfer of ownership of the various streams here, either to the City or to what is now the Port Authority. However, the record indicates this is all the trial court was presented on the issue. Under these circumstances, we conclude that the City and Krueger have not conclusively proven, as a matter of law, that the steams at issue constitute drainage owned in whole or part by the City under the ordinance.

[22] This is a permit to discharge stormwater within the MS4 system issued by the Texas Commission on Environmental Quality ("TCEQ"), and is discussed further in Section III.D.1.d.

unit, which is owned and operated by HCFCD. The Apartments presented, and Brown discussed, correspondence between Brown and HCFCD concerning the permitting and inspection of the discharge drainage pipe from the Little Nell detention facility to the HCFCD's flood control unit. Brown testified that Little Nell had to obtain a permit from HCFCD for the drainage "[b]ecause they claim that to be their wholly owned and operated facility." After that, the drainage flows to Brays Bayou, into the Houston Ship Channel, and then into the Gulf of Mexico. The Apartments also presented a deed purporting to show the transfer of the Brays Bayou detention facility property from Frank Meyer to HCFCD; Smitha agreed that the survey attached to the deed "looks like it borders or is part of Brays Bayou." In addition, Haddock testified that HCFCD calls the Brays Bayou Detention Basin the "Meyer Tract" and also described the detention facility property as "[p]art of the Mason conveyance." Further, the City's SWMP states that HCFCD constructed the "freshwater tidal marsh and wetland" within Mason Park.

Taking as true all evidence favorable to the Apartments and drawing all reasonable inferences and resolving any doubts in their favor—we conclude that the City and Krueger have not conclusively shown there is no genuine fact issue regarding whether the Little Nell property is a "benefitted property" under the ordinance and thus presumptively subject to drainage charges. *See Miranda*, 133 S.W.3d at 228. In other words, the evidence presents a fact issue as to the partial ownership or control by the City of the drainage service allegedly made available to Little Nell, and whether Little Nell discharges into any part of the city drainage utility system.

### b. Windshire

#### 1) The City and Krueger's evidence

29

According to Haddock, the drainage from Windshire flows into "a private detention facility built [sic] which the plaintiff at the site and then drains back into the [South] Shaver Road roadside open ditch system and ultimately into . . . Brays Bayou and ultimately into Sims [B]ayou," and then through the Houston Ship Channel to Galveston Bay. She stated that the Windshire drainage also flows through Milby Park, owned by the City, and that the City performs maintenance on the South Shaver Road ditches. Haddock testified that, based on her review of two purported Milby Park deeds, the City owns land to the "center line" of Sims Bayou. According to Smitha, Windshire's stormwater first drains into a private pumped detention pond, then drains into a ditch on South Shaver Road, a City-owned and –maintained street, and then to Milby Park.

2) The Apartments' evidence

Brown testified that stormwater from Windshire discharges into a roadside ditch along the east side of South Shaver Road, then flows to State Highway 3, into "an open ditch drainage channel along the railroad tracks . . . eventually making its way to Berry Bayou, on towards Sims Bayou, then to the Houston Ship Channel, and then to the Gulf of Mexico." Brown testified that South Shaver Road was and is owned, operated, and maintained by Harris County—the road "shows up on the County Road Log." According to Brown, none of the "spots" of Windshire's drainage flow is owned by the City. The Apartments also presented a deed purporting to show that the City granted an easement to HCFCD of the Milby Park land.

Taking as true all evidence favorable to the Apartments and drawing all reasonable inferences and resolving any doubts in their favor—we conclude that the City and Krueger have not conclusively shown there is no genuine fact issue regarding whether the Windshire property is a "benefitted property" under the

30

ordinance and thus presumptively subject to drainage charges. *See id.* In other words, the evidence presents a fact issue as to the partial ownership or control by the City of the drainage service allegedly made available to Windshire, and whether Windshire discharges into any part of the city drainage utility system.

### c. Regency

#### 1) The City and Krueger's evidence

Both Haddock and Smitha testified that the stormwater drainage from Regency eventually flows to Sims Bayou. Also, according to Haddock, the stormwater collected by Regency's internal drainage system flows onto Southdown Trace Trail, the City-owned street in front of the property, and into a City-owned culvert under the street. Haddock testified that the drainage then passes through a Harris County Municipal Utility District ("MUD") facility and other improvements, constructed by MUD but with the City's approval, and then eventually into Clear Lake, which she acknowledged is not owned by the City.

#### 2) The Apartments' evidence

Brown testified that there is no City-owned or –operated drainage for Regency. The stormwater from Regency is collected in an underground drainage system, "then conveyed across the entry drive into a private storm sewer, which then goes about, my recollection is 650, 700 feet of private offsite storm sewer that we had to build to convey the water and get it to the Harris County MUD Number 4-10 Regional Detention Facility." Brown stated that Regency had to obtain MUD's approval for the drainage; the Apartments presented Brown's letter to MUD "request[ing] a commitment for drainage." According to Brown, although the City has to "approve the creation of these MUD districts," the MUD districts have "a separate board that controls and operates the districts." Brown also

31

indicated at the time of development MUD represented to him that the box culvert under the street was part of a private drainage system. Brown further testified that the flow is then metered through the MUD facility into a HCFCD facility, and goes south to Clear Creek, then through Clear Lake and into Galveston Bay.

Taking as true all evidence favorable to the Apartments and drawing all reasonable inferences and resolving any doubts in their favor—we conclude that the City and Krueger have not conclusively shown there is no genuine fact issue regarding whether the Regency property is a "benefitted property" under the ordinance and thus presumptively subject to drainage charges. *See id.* In other words, the evidence presents a fact issue as to the partial ownership or control by the City of the drainage service allegedly made available to Regency, and whether Regency discharges into any part of the city drainage utility system.

### d. MS4 permit

Alternatively, even if the Apartments' stormwater discharges into property or facilities otherwise entirely owned or operated by other entities, and not the City, the City and Krueger insist that this still does not raise a fact issue as to whether the Apartments are "benefitted properties" because the ordinance "considers the MS4 as part of the City's service area and all property discharging into the MS4 as 'benefitted property.'" They provide, and we have located, no language from the drainage fee ordinance that supports this claim. Indeed, the ordinance only speaks to the dedication of existing City drainage assets to the municipal drainage utility system. Code of Ordinances, § 47-804. The City and Krueger further argue that since all the drainage at issue falls within the purview of the MS4 permit,[23] because the City is a co-permittee, the City is therefore

---

[23] The initial permit was issued by the Environmental Protection Agency; permitting later was delegated to the TCEQ.

32

responsible for all drainage within the permitted area as a "single system."

### 1) The City and Krueger's evidence[24]

Haddock and Smitha provided testimony regarding the MS4 permit. Under the Clean Water Act, the federal government began requiring municipalities to obtain permits in order to "control discharges from storm water" into U.S. waters. The MS4 permit allows four co-permittees—the City, HCFCD, Harris County, and the Texas Department of Transportation Houston District ("TxDOT")—to "use [the] MS4 system." Haddock testified that the co-permittees are "jointly responsible" for "what leaves the MS4" into U.S. and Texas waters. That is, the co-permittees engage in joint and individual programs in an effort to "eliminate the potential for pollutants and non storm water to get into and be discharged from the MS4." According to Haddock, all property in the City is covered by the MS4 permit. Haddock also testified "the bayous, the pipes, the open ditches" are part of the joint MS4 "drainage system that services, facilitates drainage within the City." Smitha stated that it was "common knowledge" that the City, HCFCD, Harris

---

[24] Although not discussed in their appellate briefing, in the trial court, the City and Krueger also presented stormwater quality permits issued by the City to the Apartments' properties in support of their claim that the City is thus responsible for all portions of the MS4 drainage. Under the relevant portion of the MS4 permit, co-permittees are charged with continuing to implement "a comprehensive master planning process (or equivalent) to develop, implement, and enforce controls to minimize the discharge of pollutants from areas of new development and significant redevelopment after construction is completed." According to Haddock, these permits help the City meet "the responsibility of making sure [pollutants] do not get into our MS4" and concern "the potential for pollutants in the storm water and non storm water leaving the property." According to Smitha, these permits "allow the plaintiff's properties to discharge storm water into the MS4" and have to be issued by the City for certain development property within the City. Brown indicated that these permits do not "establish any control over the drainage systems by the City of Houston on the plaintiffs' properties." Brown testified that the only control at issue in these permits is of the Apartments as property owners—which have to control the quality of their stormwater discharge "as it leaves the property," "before" it enters the MS4 system. Thus, the City and Krueger have not met their burden to show that the City's issuing and approving stormwater discharge permits for certain development property within the City equates to conclusive evidence of the City's having partial ownership or control over the facilities into which that property's stormwater discharge flows.

County, and TxDOT each owns and operates certain parts of the drainage system within the City, but indicated that under the MS4 "it's still one system."

2) The joint MS4 permit and individual SWMPs

The MS4 permit defines co-permittee as "one of several entities authorized under a single individual permit that is only responsible for permit conditions relating to the discharge for which it is the operator." The MS4 permit provides that each co-permittee is "individually responsible" for "[c]ompliance with permit conditions relating to discharges from portions of the JTF [Joint Task Force] MS4 for which they are the operator" and "Storm Water Management Program (SWMP) implementation on portions of the JTF MS4 for which they are the operator." Co-permittees are "jointly responsible" for "permit compliance on portions of the JTF MS4 where operational or SWMP implementation authority over portions of the JTF MS4 is shared." Each co-permittee is to develop, implement, and revise its own SWMP, and is to "provide adequate finances, staff, equipment, and support capabilities to implement their activities under the SWMPs." In addition, "[t]he SWMPs shall identify the areas of copermittees' jurisdiction for each program, element, control and activity."

The City's SWMP under the MS4 permit states that "the City has constructed or assumed responsibility for nine detention basins," "maintains a storm sewer system," and maintains its streets, bridges, ditches, and rights-of-way. The City's SWMP also states: "HCFCD is responsible for most major flood control facilities within Harris County, including within the City." HCFCD's SWMP states that it owns and operates 2500 miles of drainage channels and regional detention basins. Harris County's SWMP states that its four precincts and the Harris County Toll Road Authority are responsible for "[t]he operation and maintenance of County-owned storm sewers, roadside ditches, and roadway

34

drainage structures." Harris County's SWMP also states that HCFCD "has primary responsibility for flood control projects in Harris County." TxDOT's SWMP states that it "owns, operates and maintains the drainage system that conveys runoff from the TxDOT right-of-way," which "drainage system is typically composed of storm sewers, open ditches, outfalls, detention ponds and pump stations."

### 3) The Apartments' evidence

According to Brown, under the MS4 permit:

> There is [sic] some open channels within the city that are owned, operated and maintained by the City, but there's [sic] not very many of those. 99.9 percent of all the channels that flow through the city, open ditch channels are operated and maintained by the Harris County Flood Control District. The ownership or the underlying fee ownership or easement ownership varies from location to location.

Brown also stated that "the City and the Flood Control District get together from time to time and just dust off the list of these channels to make sure everybody clearly understands the separation of authority as to who's going to declare what as being owned and operated and maintained." Brown thus opined that the drainage system is not "one integrated system."

Taking as true all evidence favorable to the Apartments and drawing all reasonable inferences and resolving any doubts in their favor—we conclude that the City and Krueger have not conclusively shown the City's partial ownership or control of all drainage facilities subject to the joint MS4 permit, and thus that the Apartments' properties are "benefitted properties" as a matter of law. *See Miranda*, 133 S.W.3d at 228. Therefore, because the City and Krueger have failed to meet their burden to negate any genuine issue as to this jurisdictional fact, we conclude that the trial court did not err in partially denying their plea to the

35

jurisdiction with regard to the Apartments' claims that Krueger acted ultra vires by determining that their properties were "benefitted properties" subject to drainage charges. *See id.* at 227–28.

### 2. Evidence as to whether the Apartments' properties fall within the "wholly sufficient and privately owned drainage system" exemption

Alternatively, the Apartments allege that even if their properties are "benefitted properties" under the drainage fee ordinance, Krueger is committing ultra vires acts by imposing drainage charges on them because they fall within the exemption provided under section 47-822(f)(2) of the ordinance. *See* Code of Ordinances, § 47-822(f)(2). The Apartments allege that all of the drainage systems used by their properties are not a part of the city drainage system—the drainage systems they use are owned and operated by the Apartments, Harris County, and HCFCD. Thus, we next consider whether the City and Krueger have conclusively negated any genuine fact issue as to whether the Apartments' properties fall within the "wholly sufficient and privately owned drainage system" exemption.

The ordinance provides an exemption from imposition of drainage charges for "[p]roperties served exclusively by a properly constructed and maintained wholly sufficient and privately owned drainage system." *Id.* The ordinance defines "wholly sufficient and privately owned drainage system" to mean:

> land owned and operated by a person or entity other than the City's drainage utility system, the drainage of which does not discharge into a street, ditch, culvert, creek, river, slough, or other channel that is a part of the city's drainage system.

*Id.* § 47-802. We already have determined that to be part of the city drainage utility system or city drainage system, the drainage at issue must be furnished, that is, owned or controlled at least partially by the City. Thus, under the plain

36

language of the ordinance, a property is exempt from drainage charges under section 47-822(f)(2) when it is "served exclusively by a properly constructed and maintained wholly sufficient and privately owned drainage system"; that is, the property must be served exclusively by properly constructed and maintained land that is not at least partially owned or controlled by the City, the drainage of which does not discharge into drainage at least partially owned or controlled by the City. *Id.* §§ 47-801, 47-822(f)(2).

The City and Krueger argue that they proved the Apartments' properties do not fall within this exemption "because they actually discharge into the [City's] drainage system." They essentially rely on the "same evidence" that they rely on for purposes of the "benefitted property" jurisdictional fact issue. The City and Krueger also point to testimony by Haddock explaining a property only would qualify for this exemption if it were "bermed," i.e., surrounded by land that would not allow any water to leave the site, or if its detention system retained all water until it evaporated. According to Haddock and Smitha, any detention system or basin owned or operated by the Apartments does not qualify as a "wholly sufficient and privately owned drainage system" because although it may collect the stormwater on site, ultimately, it allows drainage to flow, even if at a metered rate, into the city drainage system. They point to Brown's acknowledgement that the water eventually does leave the private detention systems or basins on the Apartments' property. And, again, the City and Krueger contend even if the evidence shows that certain of the Apartments' properties discharge only onto land or into components entirely owned or controlled by another entity such as HCFCD, "[t]hese properties still utilize Houston's drainage system because it is one complete integrated holis[]tic system" under the MS4 permit.

37

However, just because stormwater is metered out and flows beyond any private detention system or basin on the Apartments' properties does not conclusively prove that the properties are not exclusively served by land owned and operated by a person or entity (such as HCFCD, Harris County, or TxDOT) other than the city's drainage utility system and that such drainage discharges into some portion of the city's drainage system. We already have determined that the City and Krueger have not conclusively shown there is no genuine fact issue regarding whether Little Nell, Windshire, and Regency's respective stormwater flows discharge into any part of the city drainage utility system and regarding the City's partial ownership or control of all drainage facilities subject to the joint MS4 permit. Likewise, whatever the course of the Apartments' respective stormwater flows, the evidence does not conclusively prove that there is no fact issue as to whether the land at issue is owned and operated by a person or entity other than the city drainage utility system.

Thus, taking as true all evidence favorable to the Apartments and drawing all reasonable inferences and resolving any doubts in their favor—we conclude that the City and Krueger have not conclusively shown there is no genuine fact issue regarding whether the Apartments' properties fall within the section 47-822(f)(2) exemption. *See Miranda*, 133 S.W.3d at 228. Because the City and Krueger have failed to meet their burden to negate any genuine issue as to this jurisdictional fact, we conclude that the trial court did not err in partially denying their plea to the jurisdiction with regard to the Apartments' claims that Krueger acted ultra vires by determining that their properties did not fall within the section 47-822(f)(2) exemption. *See id.* at 227–28.

Therefore, we overrule the City and Krueger's sole issue.

## IV.     CONCLUSION

Accordingly, we affirm the trial court's order partially denying the City and Krueger's plea to the jurisdiction.


/s/     Marc W. Brown
        Justice


Panel consists of Justices Christopher, Donovan, and Brown.