**Affirmed in Part, Reversed and Remanded in Part, and Opinion filed July 21, 2015.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00359-CV

---

### JESSICA SHANNON, Appellant

### V.

### MEMORIAL DRIVE PRESBYTERIAN CHURCH U.S., Appellee

---

**On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 2013-49928**

---

### O P I N I O N

We are asked to decide whether ecclesiastical immunity can shield a church from contractual liability when the subject contract does not implicate church doctrine. In seven issues, appellant Jessica Shannon challenges the trial court's grant of appellee Memorial Drive Presbyterian Church's plea to the jurisdiction and motions for summary judgment. Concluding that the Church is not entitled to immunity from suit under these circumstances, we reverse the trial court's grant of

the plea. Further concluding that the Church established as a matter of law that its conduct was not extreme and outrageous for purposes of Shannon's intentional infliction of emotional distress claim, we affirm the trial court's grant of summary judgment in the Church's favor on that claim. We reverse the trial court's grant of summary judgment on Shannon's other claims and remand the case to the trial court for proceedings consistent with this opinion.

## *Background*

Shannon was dismissed from her position as Elementary Ministries Director at the Church. She sent a demand letter to the Church asserting that she had been terminated for making allegations of sexual harassment against an elder of the Church. Shannon and the Church subsequently signed a "Confidential Separation Agreement and Release." The Church paid Shannon $25,000 and agreed that she could "classify the end of th[e] employment relationship as a resignation, rather than a termination . . . for purposes of . . . future employment offers." The Agreement includes a confidentiality clause applicable to Shannon and a provision that "[i]n the event that [Shannon is] asked about her separation of employment, [she] may reply only with the words 'we have reached an amicable parting,' but will not otherwise indicate the nature of the resolution of these matters." In addition, the Church and Shannon each agreed not to "disparage" the other.

Shannon subsequently was hired by the Austin Presbyterian Theological Seminary as a development officer. This position required her to participate in fundraising efforts for the Seminary. An elder at the Church also served on the Board of Trustees for the Seminary. He contacted the Board Chair at the Seminary to ask whether the Seminary had checked Shannon's references. The Board Chair contacted the President of the Seminary, who instructed Kurt Gabbard, its Vice President for Business Affairs, to check Shannon's references. Gabbard then

contacted the head of human resources at the Church, Karen Winship. Winship told Gabbard she could not discuss the reason Shannon left "because of a severance agreement," but Winship "could not think of a circumstance under which the [C]hurch would rehire [Shannon] or that she would want to come back." Winship referred Gabbard to Dave Steane, Executive Pastor at the Church, who stated that he "could not tell [Gabbard] the reasons why [Shannon] left because of the existence of an agreement[, but] it should be obvious that there were issues, otherwise there would not be an agreement." Steane also stated "that it would be difficult for [Shannon] to carry out her duties [to raise funds from the Church]" or from "anywhere in Houston." The Seminary terminated Shannon's employment because she purportedly misrepresented the circumstances surrounding her departure from the Church and based on its concern that she would not be able to solicit donations for the Seminary.

Shannon sued the Church, bringing claims for breach of contract, intentional infliction of emotional distress, libel and slander, and fraudulent inducement. The Church filed a plea to the jurisdiction, asserting the trial court lacked jurisdiction because the Church is immune from suit under the ecclesiastical abstention doctrine and the so-called ministerial exception. The Church also filed two traditional motions for summary judgment with supplements and amendments, contending (1) the Church is immune from liability under chapter 103 of the Labor Code; (2) Shannon waived her right to enforce the provisions of the Agreement by giving the Church "express authorization to provide full details concerning her past employment to the Seminary in her Employment Application"; (3) the Church did not breach the Agreement as a matter of law; (4) the Church's behavior was not extreme and outrageous for purposes of Shannon's intentional infliction of emotional distress claim; and (5) Shannon waived her fraudulent inducement claim

3

by releasing all claims that existed as of the date of the Agreement.[1] The trial court granted the plea to the jurisdiction and the motions for summary judgment and rendered final judgment for Shannon to take nothing by way of her claims against the Church.

### *Discussion*

Shannon argues the trial court has jurisdiction over her claims because neutral principles apply to the contractual dispute at issue and the ministerial exception does not apply in a non-employment context. She also asserts that chapter 103 of the Labor Code does not apply under these facts and she did not waive her claims against the Church by authorizing the Church "to provide full details regarding her past employment." She further contends that fact questions exist regarding whether the Church breached the Agreement and whether its conduct was extreme and outrageous and that the trial court erred in concluding that she released her fraudulent inducement claim.

We review a trial court's ruling on a plea to the jurisdiction de novo. *City of Pasadena v. Belle*, 297 S.W.3d 525, 528 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004)). A defendant's plea may challenge either the plaintiff's pleadings or the existence of jurisdictional facts. *Id*. When, as here, the defendant challenges the existence of jurisdictional facts, we must consider the relevant evidence submitted by the parties. *See id*. If that evidence raises a fact issue as to jurisdiction, the plea must be denied because the issue must be resolved by the factfinder. *Id*. If the relevant evidence is undisputed or fails to present a jurisdictional fact issue, however, we must rule on the plea as a matter of law. *Id*. A trial court properly

---

[1] When necessary for clarity, we refer to all of the traditional summary judgment motions at issue in this appeal together in the singular.

4

dismisses those claims over which it does not have subject matter jurisdiction but retains claims in the same case over which it has jurisdiction. *See Thomas v. Long*, 207 S.W.3d 334, 338-39 (Tex. 2006); *see also Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 152-53 (Tex. 2012) ("[A] plaintiff must demonstrate that the court has jurisdiction over . . . each of his claims; the court must dismiss those claims (and only those claims) over which it lacks jurisdiction.").

We generally analyze jurisdiction separately for each claim. *See In re C.D.B.*, No. 14-13-00718-CV, 2015 WL 1405921, at *2 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no. pet. h.). When the claims are dependent on the same facts, however, it is not always necessary to address each claim separately. *See City of Dallas v. Jones*, No. 05-07-00831-CV, 2008 WL 588997, at *4 (Tex. App.—Dallas Mar. 5, 2008, pet. denied); *cf. Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150-51 (Tex. 2013) (holding in the context of personal jurisdiction challenge that courts need not assess forum contacts on a claim-by-claim basis if all claims arise from same forum contacts).[2] The standard of review for a plea to the jurisdiction based on submitted evidence generally mirrors that of a traditional motion for summary judgment. *Quested v. City of Houston*, 440 S.W.3d 275, 279-80 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

We review de novo the trial court's grant of summary judgment. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). In a traditional motion for summary judgment, the movant has the burden of

---

[2] The Texas Supreme Court has not addressed whether it is necessary to analyze each claim separately when they all arise from the same facts in the context of a plea to the jurisdiction. We note that there may be some instances in which jurisdiction must be analyzed separately as to each claim even when the claims are dependent on the same facts, for example, when certain types of immunity apply only to certain types of claims. We note any such applicable distinctions below. However, we further note that the parties conceded at oral argument that under the facts of this case, we need not analyze Shannon's claims separately.

establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id*. (citing Tex. R. Civ. P. 166a(c)). To obtain summary judgment, the movant must conclusively disprove at least one element of each of the nonmovant's claims or conclusively establish all elements of an affirmative defense as to each claim. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). The nonmovant has no burden to respond to or present evidence regarding the motion until the movant has carried its burden to conclusively establish the cause of action or defense on which its motion is based. *State v. $90,235*, 390 S.W.3d 289, 292 (Tex. 2013). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848; *see also Quested*, 440 S.W.3d at 280. The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

With regard to a plea challenging jurisdictional facts, as here, the movant must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction. *See City of Houston v. Little Nell Apartments, L.P.*, 424 S.W.3d 640, 646 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Proof is conclusive only if reasonable people could not differ in their conclusions. *Id*. When, as in this case, the order granting summary judgment and the plea to the jurisdiction does not specify the grounds upon which the trial court relied, we must affirm if the appellant does not attack all independent grounds that may support the adverse ruling or if any of the independent grounds is

meritorious.[3] *See $90,235*, 390 S.W.3d at 292; *Sw. Bell Tel., L.P. v. Harris Cnty.*, 267 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

## I.  Ecclesiastical Abstention Doctrine Inapplicable

In her fourth issue, Shannon argues the trial court erred in granting the Church's plea on the basis of the ecclesiastical abstention doctrine because the case revolves around the breach of a secular contract. The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). This provision forbids the government from interfering with the rights of hierarchical religious bodies to either establish their own internal rules and regulations or create tribunals for adjudicating disputes over religious matters. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708−09, 724−26 (1976). Government action is not permitted to interfere with the free exercise of religion by encroaching on a religious institution's ability to manage its internal affairs. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

The Texas Supreme Court has recognized that churches have a fundamental right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Westbrook v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007); *see also Watson v. Jones*, 80 U.S. 679, 727 (1871). The autonomy of a church in managing its affairs and deciding matters of church

_____

[3] The judge signed one final judgment ruling on the plea and all motions for summary judgment.

discipline has long been afforded broad constitutional protection. *Westbrook*, 231 S.W.3d at 397; *see also Watson*, 80 U.S. at 733.

To enforce this constitutional provision, Texas courts have utilized the "ecclesiastical abstention doctrine."[4] *Reese v. Gen. Assembly of Faith Cumberland & Presbyterian Church in Am.*, 425 S.W.3d 625, 627 (Tex. App.—Dallas 2014, no pet.). The ecclesiastical abstention doctrine arises from the Free Exercise Clause of the First Amendment and provides that the First Amendment prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Milivojevich*, 426 U.S. at 713−14; *see also Jennison*, 391 S.W.3d at 664−65. Under this doctrine, courts will not attempt to right wrongs related to the hiring, firing, discipline, or administration of clergy. *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no pet.). "Although such wrongs may exist and be severe, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities which may result from its liberal application." *Id*.

The Texas Supreme Court also has recognized, however, that "[w]hile Article I, Section 6 of the Texas Constitution and the First Amendment to the United States Constitution afford broad protection to the free exercise of religion, they do not necessarily bar all claims which may touch on religious conduct." *Tilton*, 925 S.W.2d at 677. The Free Exercise Clause does not protect actions in violation of social duties or subversive to good order. *Id*.; *see also Pleasant Glade*

---

[4] This doctrine has variously been referred to as one of "deference," "ecclesiastical abstention," or "ecclesiastical exemption." *Jennison v. Prasifka*, 391 S.W.3d 660, 661 n.1 (Tex. App.—Dallas 2013, no pet.).

*Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008) ("[R]eligious practices that threaten the public's health, safety, or general welfare cannot be tolerated as protected religious belief."). Thus, acknowledging that churches, their congregations, and hierarchy exist and function within the civil community, they can be as amenable to rules governing civil, contract, or property rights as any other societal entity. *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.) ("[C]ourts do have jurisdiction to review matters involving civil, contract, or property rights even though they stem from a church controversy.")).

In determining whether the ecclesiastical abstention doctrine applies, courts must analyze whether a particular dispute is "ecclesiastical" or simply a civil law controversy in which church officials happen to be involved. *Tran*, 934 S.W.2d at 743. To resolve this issue, courts must look to the substance and effect of a plaintiff's complaint to determine its ecclesiastical implication. *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, writ denied). A court may interpret church documents under neutral principles of law when it can do so in purely secular terms without relying on religious precepts in resolving the conflict. *Hawkins v. Friendship Missionary Baptist Church*, 69 S.W.3d 756, 759 (Tex. App.—Houston [14th Dist.] 2002, no pet.). However, if the matter cannot be determined by the court without resolving a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. *Id*.

Shannon argues that her claims arise from the breach of a secular settlement agreement between a church and a former employee. Accordingly, the dispute would not require the trial court to "delve into religious dogma, interpret doctrinal

beliefs, or resolve religious matter[s] for purposes of the ecclesiastical doctrine." The Church limits its argument that ecclesiastical matters are implicated to Shannon's allegation that the Church disparaged her. Thus, we limit our discussion of this issue to that allegation. *See Little Nell Apartments*, 424 S.W.3d at 646 (noting movant in plea to jurisdiction in which pleading requirement has been met has burden to assert and conclusively prove absence of jurisdiction).

In her live petition, Shannon alleges that the Church breached the Agreement by, among other things, "disparag[ing]" her; the Church's actions caused her termination from the Seminary, resulting in "severe emotional distress" (intentional infliction of emotional distress); the Church defamed her by stating that she "would not be able to raise funds on behalf of the Seminary anywhere in Houston or within her region" and by painting her as a "liar"; and the Church fraudulently induced her to sign the Agreement "so that it could buy her silence while it went about its business of disparaging her." The Church concedes that these claims "all arise from her allegation that the Church made disparaging statements about her to the Seminary." We agree. Thus, we analyze these claims together, except as otherwise noted. *See Jones*, 2008 WL 588997, at *4.

The Agreement states, "[The Church] agrees that it will not disparage [Shannon]." Our primary concern in interpreting a contract is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract, so that none will be rendered meaningless. *J.M. Davidson*, 128 S.W.3d at 229.

The Agreement does not define the word "disparage." The Church argues the trial court could not consider whether the Church disparaged Shannon because it would have to determine whether the Church's statements were "false or made with malice." As an initial matter, we reject this definition urged by the Church, which is gleaned from the elements of business disparagement. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) ("The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages.").[5] If the parties had intended to define the word as synonymous with *business disparagement*, which has a particular legal meaning, they could have done so. We decline to apply this definition. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included."). Instead, we apply the plain meaning of the word "disparage" in analyzing whether the ecclesiastical abstention doctrine applies.[6] *See Dynegy Midstream Servs.*, 294 S.W.3d at 168. "Disparage" is defined as "[t]o speak of as unimportant or small; belittle" or "[t]o reduce in esteem or rank." *The American Heritage Dictionary* 406 (2d coll. ed. 1991); *see also In re Peebles*, No. 14-10-00973-CV, 2010 WL 4892634, at *4 (Tex. App.—Houston [14th Dist.] Dec. 2, 2010, no pet.) (mem. op.) (referring to plain meaning of "disparage" as "to depreciate").

The Church argues a determination of whether it disparaged Shannon would fall within the ecclesiastical abstention doctrine because it would require the trial

---

[5] A private individual such as Shannon need not prove malice to establish defamation. *See In re Lipsky*, No. 13-0928, 2015 WL 1870073, at *9 (Tex. Apr. 24, 2015). Thus, any argument by the Church that Shannon should be required to show the Church acted with malice would be without merit.

[6] The Church puts forth various other meanings for the word. For the reasons discussed, we reject any definition other than the plain meaning.

court to evaluate (1) the reasons the Church decided to terminate Shannon and to settle her claims for sexual harassment, (2) the decision to notify the Seminary of the Church's issues with Shannon, and (3) whether such decisions were in the best interest of the Church, the Seminary, and the Presbyterian community in Houston. We disagree.

Shannon's allegations are directed toward the Church's actions after the parties signed the Agreement and after Shannon assumed a new position at the Seminary, not at the Church's decisions related to her termination. Thus, the allegations do not invoke the reasons she left the Church. The parties agree that Shannon's claims revolve around the parties' Agreement, in which the Church agreed not to "disparage" Shannon. The reason the Church elder asked the Seminary to check Shannon's references has no relevance in determining whether the Church disparaged her. The reasons behind the Church's decisions both before and after Shannon left—and whether these decisions were in the Church's best interest—likewise are irrelevant to the question of whether the Church disparaged Shannon.

The Church argues that it is immune from suit because "what is 'disparaging' involves subjective judgment through the eyes of the Church." To the contrary, applying the plain meaning of the word "disparage," a factfinder could determine whether the Church belittled Shannon or "reduce[d her] in esteem or rank" when, as alleged, (1) a Church member initiated a conversation with the Seminary about Shannon's references after Shannon already had been hired, (2) Winship, the Church's head of human resources, told Gabbard, the representative from the Seminary, that she could not discuss the reasons Shannon left the Church but also "could not think of a circumstance under which the [C]hurch would rehire [Shannon] or that [Shannon] would want to come back,"

12

and (3) Steane told Gabbard that "it should be obvious that there were issues, otherwise there would not be an agreement" and "it would be difficult for [Shannon] to carry out her duties as a fundraiser" anywhere in Houston. Although these facts may be disputed, they can be analyzed under a neutral definition in purely secular terms.[7]

We may interpret a contract in a civil law controversy in purely secular terms when doing so does not require us to rely on religious precepts or resolve a religious controversy. *See Lacy*, 132 S.W.3d at 123. Making the determination of whether the Church disparaged Shannon merely involves interpreting the contract as a matter of law and applying the facts as found by the factfinder. Moreover, under these circumstances, we are not required to intervene in the hiring, firing, discipline, or administration of the Church's clergy, address the Church's standards of morality, or address any other matters traditionally held to involve religious doctrine. *See id*. at 125. Similarly, we are not required to interpret any Church constitution, by-laws, or other governing documents. *See id*. Finally, we are not asked to decide matters relating to the congregational or hierarchical nature of the Church. *See id*. We conclude that this lawsuit, revolving around the Church's purported disparagement of Shannon in violation of the Agreement, is a civil law controversy in which Church officials happen to be involved. *See id*. at 123. Accordingly, the ecclesiastical abstention doctrine does not apply.

We sustain Shannon's fourth issue.

## II.    Ministerial Exception Not a Jurisdictional Bar

In its plea to the jurisdiction, the Church also argued the "ministerial

---

[7] We note that the Church has not offered any religious explanation for its actions that might entangle the court in a religious controversy in violation of the First Amendment. *See Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 472 (8th Cir. 1993).

exception" required dismissal of Shannon's claims. Under this doctrine, if an employee is a minister, courts are precluded from reviewing the employment decision regardless of whether the claims are ecclesiastical in nature. *See Patton v. Jones*, 212 S.W.3d 541, 548 (Tex. App.—Austin 2006, pet. denied); *see also Lacy*, 132 S.W.3d at 123 ("[C]ourts should not involve themselves in matters relating to the hiring, firing, discipline, or administration of clergy."). The United States Supreme Court has recognized the ministerial exception; however, the court concluded that the "exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 132 S. Ct. 694, 709 n.4 (2012) ("That is because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'"). The Church moved only on the ministerial exception as a jurisdictional bar and did not move for summary judgment as to this affirmative defense. Accordingly, the trial court erred to the extent that it concluded it did not have subject matter jurisdiction over Shannon's claims under the ministerial exception. We sustain Shannon's fifth issue.

For the foregoing reasons, we conclude the trial court erred in dismissing Shannon's claims for lack of subject matter jurisdiction. We turn to the other issues addressed in the Church's motions for summary judgment.

### III.    Labor Code Chapter 103 Inapplicable

In her first issue, Shannon argues that the Church was not entitled to immunity from her claims under chapter 103 of the Labor Code. The legislature enacted chapter 103 to provide the affirmative defense of immunity from civil liability to an employer who makes a disclosure based on information that he "would reasonably believe to be true." Tex. Labor Code § 103.001; *see Graham v.*

14

*Rosban Constr., Inc.*, No. 03-07-00317-CV, 2009 WL 3319911, at *3 (Tex. App.—Austin Oct. 14, 2009, no pet.) (mem. op.). Under the statute, "An employer may disclose information about a current or former employee's job performance to a prospective employer of the current or former employee on the request of the prospective employer or the employee." Tex. Labor Code § 103.003(a).

Shannon asserts chapter 103 does not apply because Church representatives did not discuss her job performance with Gabbard.[8] "Job performance" is defined in the statute as "the manner in which an employee performs a position of employment and includes an analysis of the employee's attendance at work, attitudes, effort, knowledge, behaviors, and skills." *Id*. § 103.002(3). Steane confirmed that Shannon did not leave based on any allegations of sexual misconduct by her, expressed concern that Shannon would have difficulty soliciting donations for the Seminary, and stated that "there were issues, otherwise there would not be an agreement." Winship also indicated the Church would not rehire Shannon and Shannon would not want to come back. Shannon argues these statements do not reflect the manner in which she performed her job as Elementary Ministries Director and include no analysis of her attendance, attitudes, effort, knowledge, behavior, or skills.

The Church cites *Graham* to support its argument that its statements related to Shannon's job performance.[9] In that case, a former employer told a prospective

---

[8] Shannon also contends that the statute does not apply because (1) the Seminary was her current, not prospective, employer when the damaging reference was given by the Church; (2) the reference was not given "on the request of" the Seminary because the Church elder, purportedly at the prompting of Steane, suggested the Seminary should inquire; (3) Steane's disclosures were made with malice; (4) chapter 103 only applies to defamation claims; and (5) the Church waived any protections under chapter 103 by agreeing not to "disparage" Shannon. We need not reach these arguments because we agree that Church representatives did not discuss her job performance with Gabbard.

[9] We note that the Church also cited *Leija v. Sky Properties, LLC*, No. 01-13-00019-CV,

15

employer that when the company instituted a drug testing policy, the plaintiff chose to quit rather than be tested. *Graham*, 2009 WL 3319911 at *2. The plaintiff argued that this statement did not relate to his job performance as a truck driver. *See id*. at *4. The court concluded that the statement fell within the definition of job performance because the plaintiff was required to participate in drug testing as part of his job in compliance with company policy. *Id*.

Here, the Church did not present evidence of any statements to the Seminary relating to Shannon's violation of any policy of the Church or failure to perform her job as required by the Church. The Church did not establish that Steane's statement expressing doubts about Shannon's ability to solicit donations for the Seminary was related to the manner in which she performed her job at the Church. At most, one might infer that Shannon left the Church on unfavorable terms, but these statements provide no analysis of her attendance, attitudes, effort, knowledge, behavior, or skills as Elementary Ministries Director. Accordingly, the Church has not conclusively established its entitlement to summary judgment on the affirmative defense of immunity under chapter 103.

We sustain Shannon's first issue.

## IV.  Failure to Present Conclusive Evidence of Intent to Waive Claims

In her third issue, Shannon contends that she did not waive her claims against the Church by filling out an online employment application for her position

---

2014 WL 523474 (Tex. App.—Houston [1st Dist.] Jan. 30, 2014, no pet.), in this section of its brief; however, neither *Leija* nor the Church's argument addresses job performance. Moreover, the *Leija* court did not address chapter 103. It addressed the common law privilege for statements made by a former employer to a prospective employer. *Id*. at *3. We need not address whether the common law privilege applies under the facts of this case, as the Church has not asserted it and it had the burden to conclusively establish immunity. *See Little Nell Apartments*, 424 S.W.3d at 646 ("[T]he movant must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction.").

at the Seminary in which she "authorize[d] all [her] prior employers to provide full details concerning [her] past employment."[10] Specifically, Shannon contends that this authorization did not waive her rights under the confidentiality and anti-disparagement clauses of the Agreement. Shannon argues that she was entitled to rely on the Church to honor its obligation under the Agreement not to disparage her.

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Tenneco*, 925 S.W.2d at 643. The elements of waiver are (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008); *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 542 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Intent to waive must be clear, decisive, and unequivocal. *Thompson v. Kerr*, No. 14-08-00978-CV, 2010 WL 2361636, at *4 (Tex. App.—Houston [14th Dist.] June 15, 2010, no pet.) (mem. op.) (citing *Ferguson v. Ferguson*, 111 S.W.3d 589, 598 (Tex. App.—Fort Worth 2003, pet. denied)). A court should conclude a waiver occurred only when a party unequivocally manifested the intent not to assert her rights.[11] *Id*. (citing *Robinson v. Robinson*, 961 S.W.2d 292, 299 (Tex. App.—Houston [1st Dist.] 1997, no writ)).

The Church cites *Smith v. Holley*, in which a police chief provided to a prospective employer certain information from the plaintiff's personnel file despite

---

[10] The Church presented a copy of the employment application in support of its motion for summary judgment.

[11] Waiver is ordinarily a question of fact. *Tenneco*, 925 S.W.2d at 643. When the facts and circumstances are admitted or clearly established, however, the question becomes one of law. *Id*.

an agreement that the information would be purged. 827 S.W.2d 433, 435-36 (Tex. App.—San Antonio 1992, writ denied). In *Smith*, the plaintiff signed an authorization similar to the one at issue here, except for an additional paragraph: "I hereby release any individual, including record custodians, from any and all liability for damages of whatever kind or nature which may at any time result to me on account of compliance, or any attempts to comply, with this authorization." *Id.* at 435. A copy of the authorization was given to the police chief before he provided the offending information.[12] Although the court in *Smith*, which predates Chapter 103 of the Labor Code, found the police chief enjoyed a qualified privilege as to plaintiff's defamation claim, it made no holding as to waiver.[13] *Id.* at 439-40. *Smith* is distinguishable.

Assuming Shannon authorized the Church to speak with the Seminary, the Church nevertheless was bound to communicate in accordance with the terms of its Agreement. We conclude that in signing the authorization, Shannon did not unequivocally manifest the intent not to assert any of her rights under the Agreement. In other words, Shannon did not authorize the Church to disparage her.[14] Accordingly, the Church has not conclusively established that Shannon

---

[12] There is no evidence in our record regarding when or how the Church obtained a copy of Shannon's authorization.

[13] The *Smith* court held that the plaintiff consented to the disclosure. 827 S.W.2d at 439. However, the scope of a plaintiff's consent "does not exceed what is reasonable in light of the language or circumstances that created it." *Brooks v. AAA Cooper Transp.*, 781 F. Supp. 2d 472, 485 (S.D. Tex. 2011) (quoting *Smith*, 827 S.W.2d at 439). *Brooks* noted the language in the *Smith* release cited above "is worded broadly enough to reach all kinds of defamatory remarks" and "releases every kind of lawsuit imaginable." *Brooks*, 781 F. Supp. 2d at 485 (quoting *Smith*, 827 S.W.2d at 439-40).

[14] Shannon also argues that, despite signing the authorization, she was entitled to rely on the Church to confirm that her departure was "amicable." She bases this contention on the confidentiality clause in the Agreement, which required her, if asked about her departure from the Church, to respond that she and the Church had "reached an amicable parting." While the Church's statements that Shannon left "because of a severance agreement," the Church would

18

intended to waive her claims by signing the authorization.

We sustain Shannon's third issue.

## V.   Breach of Contract Not Disproven as a Matter of Law

In her second issue, Shannon argues the trial court erred in rendering summary judgment in the Church's favor on her breach of contract claim. The Church asserted in its motion for summary judgment that it did not breach the Agreement as a matter of law.

### A. Provisions at Issue Construed in Light of Non-disparagement Clause

The Church asserted in its motion that the following provisions quoted from the Agreement did not impose any obligations on the Church:

- [Shannon] and [the Church] agree that for purposes of [Shannon's] future employment efforts, [Shannon] may classify the end of this employment relationship as a resignation, rather than a termination.

- <u>Confidentiality</u>. This Agreement and its terms shall be maintained in strict confidence by [Shannon]. [Shannon] agrees that she will not disclose, directly or indirectly, the terms of this Agreement or of any communications constituting or concerning the negotiation of this Agreement to any third person, apart from [Shannon's] immediate family and any attorney or tax advisor that [Shannon] may consult concerning this Agreement. In the event that [Shannon], her immediate family, tax advisor, and attorneys are asked about her separation of employment, [Shannon] may reply only with the words "we have reached an amicable parting," but will not otherwise indicate the nature of the resolution of these matters.

---

not rehire Shannon, and "there were issues, otherwise there would not be an agreement" do not provide any details of the reasons for her departure, they do conflict with the idea that Shannon parted from the Church on "amicable" terms—which is what Shannon was constrained to tell the Seminary under the Agreement—and thus could be construed by the factfinder as disparaging her under the circumstances. Whether the Church's statements were disparaging is a fact question for the jury, as discussed below.

Shannon responded that the first provision was a mutual agreement that Shannon resigned and was not terminated and that the confidentiality clause was binding on both parties.

As discussed above, in construing contracts, we must ascertain and give effect to the parties' intentions as expressed in the instrument. *See J.M. Davidson, Inc.*, 128 S.W.3d at 229. If the written instrument permits us to ascertain a definite legal meaning as to which one of two possible meanings is proper, the contract is not ambiguous, and we will interpret the contract as a matter of law. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Id*. Because we conclude the language of the Agreement can be given a definite legal meaning, and it is not reasonably susceptible to more than one meaning, it is unambiguous, and we construe the Agreement as a matter of law. *See id*.

We construe these provisions in light of the non-disparagement clause in the Agreement, in which the Church agreed not to disparage Shannon. The Church agreed that Shannon could classify her departure from the Church "as a resignation, rather than a termination" and required Shannon to tell prospective employers, if asked, *only* that she and the Church had "reached an amicable parting" but to refrain from sharing "the nature of the resolution of [the parties' dispute]." Construing these provisions in light of the Agreement as a whole, the Agreement limited the Church's ability to reveal any aspects of Shannon's departure in a way that would disparage her, by for example, implying that she misrepresented the nature of her departure from the Church.

## B. Fact Question on Disparagement Exists

The Church further argued in its motion that, as a matter of law, it did not

disparage Shannon. The Church relied on the elements of business disparagement and contended that Shannon was required to prove that its statements were defamatory and malicious or false. We have already declined to apply this definition of disparagement. As discussed, we apply the plain meaning of the word to determine whether the Church conclusively established it did not disparage Shannon.

Shannon presented the following evidence in support of her response to the Church's summary judgment motion. She attested she was not terminated from the Church because of her job performance or attitude. She further attested that she was fired because she "reported sexual harassment and false imprisonment to [the Church] that [she] had suffered [at] the hands of a very active and wealthy [Church] volunteer/Elder elect" and because she made a comment on a social networking website about drinking a beer "that offended an undisclosed member of [the Church]." During her interview for the position at the Seminary, Shannon indicated that she had left the Church on amicable terms after she and her supervisor, who "left around the same time," "had revived the children's ministry." Shannon did not discuss the Agreement or any reasons for her departure from the Church. Gabbard later told Shannon she was being terminated from the Seminary because she "had lied on [her] application to the Seminary as to why she left the [Church]."

Shannon also presented Gabbard's deposition testimony, which reflects the following information. Gabbard learned about the Agreement from Winship and Steane. He inferred from the existence of the Agreement that Shannon and the Church had had a "disagreement" and "likely she [had] left the employment of the [C]hurch on less-than-favorable terms." Gabbard testified: "[T]here was some reason that [Shannon] left the employment of [the Church] that would lead to a

21

severance agreement and would indicate that, just the existence of that, that she left on other than favorable terms." Gabbard further testified that Steane's comments regarding Shannon's purported inability to raise funds within the Church and the Houston Presbyterian community was a "major factor" leading to her termination. Shannon attested that she did not participate in fundraising at the Church.

Shannon further presented Gabbard's notes from his phone conversation with Steane. Gabbard noted that Steane contacted the Church elder on the Seminary's Board of Trustees, who in turn contacted a representative of the Seminary to prompt a reference check for Shannon.

The forgoing evidence supports the conclusion that the Seminary's decision to terminate Shannon was made as a direct result of Steane's instigating a reference check by the Seminary, as well as Winship's and Steane's comments that (1) Shannon left because of a severance agreement, from which one could infer that "obviously" there had been "issues," (2) the Church would not rehire Shannon, and (3) Shannon could not raise funds from the Church or anywhere in Houston. Accordingly, a fact question exists as to whether the Church's statements to the Seminary belittled Shannon or "reduce[d her] in esteem or rank." In conclusion, the Church did not conclusively establish it did not disparage Shannon.

We conclude that the Church did not conclusively establish as a matter of law that it did not breach the Agreement. We thus sustain Shannon's second issue.

## VI. No Extreme and Outrageous Conduct

In her sixth issue, Shannon argues the trial court erred in rendering summary judgment in the Church's favor on Shannon's intentional infliction of emotional distress claim. The Church moved for summary judgment on the basis that its conduct was not extreme and outrageous.

22

To prevail on this claim, Shannon would have to prove, among other things, that the Church's conduct was extreme and outrageous. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). A defendant's conduct satisfies the second element only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)).

Whether conduct is extreme and outrageous for the purpose of intentional infliction of emotional distress generally is a question of law. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817 (Tex. 2005). Such claims are submitted to the jury only when reasonable minds may differ. *Id*. Intentional infliction claims do not extend to ordinary employment disputes. *Id*. Certain post-termination conduct may constitute intentional infliction, but "[c]allous, meddlesome, mean-spirited, officious, overbearing, and vindictive" conduct is not enough. *Id*. As set forth above, the conduct must "go beyond all possible bounds of decency" and "be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. The supreme court has gone so far as to say that "except in circumstances bordering on serious criminal acts," even claims "stemming from heinous acts . . . rarely have merit as intentional infliction claims." *See id*. at 818.

In *Creditwatch*, a former supervisor made lewd advances toward a woman after her employment had been terminated. *Id*. at 816. When she rebuffed his advances, the supervisor refused to give her a reference letter. *Id*. at 817. The supervisor also required a current employee—who had invited her financially-strapped former co-worker to live in her home—to evict the woman if the employee wanted to keep her job. *Id*. The supreme court held that this behavior was not extreme and outrageous under the required standard for intentional

23

infliction of emotional distress. *Id*. at 817-18.

Here, the Church's actions purportedly resulted in Shannon's termination of employment with the Seminary based on the Church's instigating a conversation with the Seminary about Shannon's departure from the Church and providing an unfavorable reference. While these actions may be interpreted as "[c]allous, meddlesome, mean-spirited, officious, overbearing, and vindictive," they do not rise to the level of extreme and outrageous conduct required to maintain an intentional infliction of emotional distress claim. *See id*.

The Church conclusively established that it was entitled to summary judgment on this claim. We overrule Shannon's sixth issue and affirm the trial court's judgment in the Church's favor on Shannon's intentional infliction claim.

## VII. No Waiver of Fraudulent Inducement Claim or Disclaimer of Reliance

In her seventh issue, Shannon contends the trial court erred in rendering summary judgment in favor of the Church on her fraudulent inducement claim because she asserts she did not release that claim. In the Agreement, Shannon released the Church "from any and all claims . . . which [Shannon] now has or may have . . . whether now known or unknown . . . ." Shannon further agreed that the release "extend[ed] to all claims of every nature and kind, known or unknown, arising from, attributable to, or related to any of the claims released" and agreed to

> waive[] and assume[] the risk of any and all claims for damages which exist[ed] as of the date of [the] release, but of which [s]he [did] not know or expect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect [Shannon's] decision to enter into [the r]elease.

The Church argues that Shannon released her fraudulent inducement claim because it would have existed at the time she signed the Agreement.

Texas law favors and encourages voluntary settlements and orderly dispute resolution. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997). However, a release is a contract, and like any other contract, is subject to avoidance on the ground of fraud. *Id*. Courts thus face competing concerns: the ability to set aside a contract procured by fraud and the ability of the parties to "fully and finally resolve disputes between them." *Id*. at 179. Parties may waive fraudulent inducement claims by disclaiming reliance, which is essential to a fraudulent inducement claim. *Id*. A release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement, depending on the circumstances. *Id*. at 181. We apply rules of contract interpretation to determine whether a release contemplates the clear and unequivocal expression of intent necessary to disclaim reliance on specific representations underlying a fraudulent inducement claim. *See id*. at 179.

We decide whether the parties expressed a clear and unequivocal intent to disclaim reliance on representations or to waive fraudulent-inducement claims as a threshold matter.[15] *Tex. Standard Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.*, 394 S.W.3d 753, 763 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Ultimately, the determination of whether a provision forecloses a fraudulent inducement claim is a question of law. *Dresser-Rand Co. v. Bolick*, No. 14-12-00192-CV, 2013 WL 3770950, at \*7 (Tex. App.—Houston [14th Dist.] July 18, 2013, pet. abated)

---

[15] A disclaimer of reliance will not always preclude a fraudulent-inducement claim. *Schlumberger*, 959 S.W.2d at 181. Once the intent to disclaim reliance is established, a court should be guided by four factors in determining the enforceability of a disclaimer of reliance: (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; and (4) the parties were knowledgeable in business matters. *Dresser-Rand Co. v. Bolick*, No. 14-12-00192-CV, 2013 WL 3770950, at \*7 (Tex. App.—Houston [14th Dist.] July 18, 2013, pet. abated) (mem. op.).

(mem. op.) (citing *It. Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)).

Paraphrasing the above contractual language, Shannon released all claims that existed at the time she signed the Agreement. However, reading the Agreement as a whole, there is no express waiver of any fraudulent inducement claims or any indication that Shannon disclaimed reliance on any of the Church's representations about the matters in dispute in this case. Thus, the Agreement does not reflect a clear and unequivocal intent to disclaim reliance on representations or to waive fraudulent-inducement claims, and we need not reach the factors to determine the enforceability of any disclaimer of reliance. *See Tex. Standard*, 394 S.W.3d at 763 (acknowledging expression of "clear and unequivocal" intent to disclaim reliance is threshold requirement to be satisfied before consideration of other factors); *see also It. Cowboy Partners*, 341 S.W.3d at 334 (holding standard merger clause including language indicating that no representations were made other than those contained in the contract did not reflect intention to disclaim reliance on representations).

We conclude that the Church has not established as a matter of law that Shannon released her fraudulent inducement claim by agreeing to release her claims existing at the time she signed the Agreement. We sustain Shannon's seventh issue.

### *Conclusion*

We conclude the trial court erred in dismissing Shannon's claims for lack of subject matter jurisdiction and rendering summary judgment as to Shannon's claims other than intentional infliction of emotional distress. We affirm the trial court's judgment on the intentional infliction claim but reverse the judgment as to

26

Shannon's other claims.  We remand this case for proceedings consistent with our opinion.


/s/    Martha Hill Jamison
       Justice


Panel consists of Justices Jamison, Busby, and Brown.