**Judgment Vacated, Case Dismissed, and Opinion filed May 10, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-15-00087-CV

---

## HARPINDER SINGH, JAGJIT S. GILL, AND BALDEV SINGH, ET AL., Appellants

### V.

## GURNAM SINGH SANDHAR, INQLABI THANDI, DALJIT SINGH, BALJINDER SINGH BHATTI, SODAGAR SINGH VIRK, AND BALJINDER SINGH, Appellees

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-51397**

---

### O P I N I O N

This is a dispute over membership in a Sikh temple. In three issues, appellants Harpinder Singh, Jagjit S. Gill, and Baldev Singh challenge the trial court's grant of summary judgment in favor of appellees Gurnam Singh Sandhar, Inqlabi Thandi, Daljit Singh, Baljinder Singh Bhatti, Sodagar Singh Virk, and Baljinder Singh based

on the ecclesiastical abstention doctrine.[1] Concluding the trial court lacked jurisdiction over all the claims in this lawsuit, we vacate the judgment and dismiss the case for lack of subject matter jurisdiction.

### *Background*

The Gurudwara Sahib of Houston, Inc. is a Sikh temple in Houston, Texas. According to the temple bylaws, a seven member executive committee, the Prabandhak Committee, is "responsible for the day to day activities" of the temple. In 2012, the temple received a large number of membership applications. This influx of new member applicants created two factions: one supported the acceptance of the new members, and the other did not.[2] The bylaws require prospective applicants to receive the unanimous approval of the Prabanhak Committee before they can be admitted as members.

Per agreement, new members were nominated and then appointed to the Prabanhak Committee from both competing factions, which contravened a requirement in the bylaws to hold committee elections every two years. Subsequently, it was announced that a general membership meeting would be held to address amending the bylaws to change the method of selecting members of the committee. Certain members and prospective members of the temple filed suit against the temple, the Prabanhak Committee, and the Committee Members to enjoin that meeting and to remove those Committee Members who had been appointed without an election.

---

[1] Appellants intervened in this lawsuit "filing individually and as representatives of [a] group of over 1,000 [purportedly] disenfranchised voters and members of the [temple]." We refer to appellants collectively throughout this opinion as "Intervenors." Appellees are current or former members of the temple's executive committee. We refer to them collectively as "Committee Members."

[2] For ease of reference, we refer to these groups as "factions" when we do not refer specifically to Intervenors or Committee Members.

The trial court granted a temporary injunction on the grounds that (1) the Prabanhak Committee failed to conduct an annual meeting during which four of seven members of the committee would have been replaced through an election by members of the temple; (2) certain parties assumed positions as members of the committee without a vote; and (3) they had been "governing the [temple] without authority." The trial court reconstituted the prior Prabanhak Committee and ordered the temple to conduct an annual meeting and election in accordance with the bylaws "using the membership list as it existed" when the election should have been held. The trial court noted that it lacked subject matter jurisdiction over other issues raised by the parties and referred "the parties to their Akal Takht [High Priest] for final resolution of continuing issues."[3] The trial court further ordered that the High Priest had "the authority and responsibility to finally resolve all issues which the [Prabanhak] Committee and/or Directors are not able or willing to resolve [including] issues relating to the membership list for purposes of the election ordered by the [trial court]."

One faction of the Prabanhak Committee wanted to use a membership list that included approximately 1,600 people for the election, and one faction wanted to use a membership list that included approximately 600 people. The faction that advocated using the smaller list asked the High Priest to resolve the dispute. The High Priest issued an approved membership list "for the purpose of elections" that included 618 members. This approved list was filed in the trial court. Certain disgruntled

---

[3] According to the bylaws, "serious" disputes were to be referred to the Akal Takht for resolution. The bylaws do not define "Akal Takht," but testimony in the record indicates that it is a temple located in India where a committee of five people resolves disputes. It apparently was represented to the trial court, however, that Akal Takht was the High Priest of the temple in Houston, as reflected in the trial court's order denying a motion to dissolve the injunction: "Finally, the authority granted to the Akal Takht (who is presently Bhail Sharnjeet Singh [the High Priest]) . . . includes the authority and responsibility to finally resolve all issues which the Committee and/or Director are not able or willing to resolve."

Committee Members then fired the High Priest.

The trial court held a status conference and stated that the High Priest still would be the person to resolve any and all disputes within the Prabanhak Committee. The trial court determined that the High Priest's approved membership list would be used for the election. However, two elections were held using the two different lists.

A motion for contempt was filed against the faction that used the unapproved list. The trial court found the faction in contempt and concluded the approved list "is the valid and controlling membership list for the [temple] going forward." The court ordered that the election held with the approved list was the "valid and controlling" election and voided the results of the other election.[4]

Intervenors subsequently filed a petition in intervention, complaining that they were excluded from the High Priest's approved membership list and prevented from voting in the election. Intervenors sought a court order declaring them voting members in the temple instead of allowing the High Priest to resolve the membership dispute. The Committee Members filed a motion for summary judgment on the grounds that Intervenors' claims regarding the election dispute were moot and the trial court lacked jurisdiction over the claims regarding membership. The trial court granted the motion, concluding that it lacked jurisdiction over the dispute as follows:

> The dispute in this litigation quickly became an issue over who could vote in the election mandated in the by-laws. This is a purely ecclesiastical matter. It is not the business of this Court or any other court to tell the Sikh community who is or is not a good Sikh, worthy of voting. The by-laws set out rules for membership, but they also set out how disputes are resolved. They are resolved internally.

---

[4] Many of the above facts are taken from supporting exhibits attached to the Committee Members' motion for summary judgment, including unofficial copies of the trial court's temporary injunction order, "Order on Defendants' Motion to Dissolve Permanent Injunction; Motion for New Trial; and Motion to Re-Open for Additional Evidence," and "Order Granting Defendants' Motion for Contempt."

The trial court then rendered final judgment "dispos[ing] of all claims and all parties."

## *Discussion*

In three issues, Intervenors contend that the trial court erred in concluding that it lacked subject matter jurisdiction over their claims for breach of contract, collusion, and fraud: they assert the claims are secular and not barred by the ecclesiastical abstention doctrine. They further complain of the trial court's previous rulings intervening in the Prabanhak Committee election process and assigning the right to determine temple membership to the High Priest. They argue that the trial court's rulings on the ecclesiastical abstention doctrine have been inconsistent.

We treat motions for summary judgment on jurisdictional grounds as pleas to the jurisdiction. *See Thomas v. Long*, 207 S.W.3d 334, 339-40 (Tex. 2006). We review a trial court's ruling on a plea to the jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004); *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 619 (Tex. App.—Houston [14th Dist.] 2015, pet. filed). We first look to the pleadings to determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Miranda*, 133 S.W.3d at 226. We construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true the factual allegations in the pleadings. *Id*. The allegations found in the pleadings may affirmatively demonstrate or negate the court's jurisdiction. *City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009); *City of Houston v. Song*, No. 14-11-00903-CV, 2013 WL 269036, at *2 (Tex. App.—Houston [14th Dist.] Jan. 24, 2013, pet. denied) (mem. op.).

When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties. *Miranda*, 133 S.W.3d at 226. The standard of review for a jurisdictional plea based on evidence "generally mirrors

5

that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id*. at 228. Under this standard, we credit evidence favoring the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Id*. The defendant must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction. *Id*. If the defendant discharges this burden, the plaintiff must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained. *Id*.

We generally analyze jurisdiction separately for each claim. *See Trant v. Brazos Valley Solid Waste Mgmt. Agency, Inc.*, 478 S.W.3d 53, 58 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). When, as here, the claims are dependent on the same facts, however, it is not necessary to address each claim separately. *See id*.

The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). This provision forbids the government from interfering with the rights of hierarchical religious bodies to either establish their own internal rules and regulations or create tribunals for adjudicating disputes over religious matters. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–09, 724–25 (1976). Government action is not permitted to interfere with the free exercise of religion by encroaching on a religious institution's ability to manage its internal affairs. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

The Texas Supreme Court has recognized that churches have a fundamental right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Westbrook v. Penley*, 231 S.W.3d

6

389, 397 (Tex. 2007); *see also Watson v. Jones*, 80 U.S. 679, 727 (1871). The autonomy of a church in managing its affairs and deciding matters of church discipline has long been afforded broad constitutional protection. *Westbrook*, 231 S.W.3d at 397; *see also Watson*, 80 U.S. at 733.

To enforce this constitutional provision, Texas courts have utilized the "ecclesiastical abstention doctrine." *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 621 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). The ecclesiastical abstention doctrine arises from the Free Exercise Clause of the First Amendment and provides that the First Amendment prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Milivojevich*, 426 U.S. at 713–14; *see also Shannon*, 476 S.W.3d at 621-22.

In determining whether the ecclesiastical abstention doctrine applies, courts must analyze whether a particular dispute is "ecclesiastical" or simply a civil law controversy in which church officials happen to be involved. *Shannon*, 476 S.W.3d at 622. To resolve this issue, courts must look to the substance and effect of a plaintiff's complaint to determine its ecclesiastical implication. *Id*.

## I. Ecclesiastical Abstention Doctrine Inapplicable to Membership Disputes

In their first issue, Intervenors argue that the trial court erred in granting summary judgment on the basis of the ecclesiastical abstention doctrine because their claims for breach of contract, collusion, and fraud are secular and, as such, the doctrine does not apply. In this case, the High Priest determined who would be included on the membership list for the temple. Intervenors contend that in doing so,

7

the High Priest violated temple bylaws.[5] However, assuming the truth of this allegation, the temple's failure to follow its bylaws regarding temple membership is a matter of internal church governance and ecclesiastical concern. *See Retta v. Mekonen*, 338 S.W.3d 72, 77 (Tex. App.—Dallas 2011, no pet.). The courts may not interfere with that decision.[6] *See id.*

Intervenors assert, however, that the trial court had jurisdiction over their claims for breach of contract, collusion, and fraud under the "neutral principles of law" approach, which, they argue, permits a trial court to interpret and enforce the temple's bylaws and resolve the conflict over membership without relying on religious precepts. *See Westbrook*, 231 S.W.3d at 398; *see also Retta*, 338 S.W.3d at 77. Though courts may determine certain disputes involving religious entities, such as property ownership and whether trusts exist, applying a neutral principles of law approach, courts still must defer to religious entities' decisions on ecclesiastical and church polity issues, such as criteria for membership. *Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 650 (Tex. 2013); *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 605-06 (Tex. 2013). As the Texas Supreme Court has recognized, the line between required judicial action and forbidden judicial intrusion "will not always be distinct" because many disputes "require courts to analyze church documents and organizational structures to some degree." *Masterson*, 422 S.W.3d at 606; *Thiagarajan v. Tadepalli*, 430 S.W.3d 589, 595 (Tex. App.—Houston [14th

---

[5] Appellants contend that the trial judge's order erroneously conflated the title of High Priest with Akal Takht and that actions taken by the High Priest were not authorized by the bylaws.

[6] In *Retta*, a church's board of trustees amended its bylaws to add a monthly contribution as a requirement for membership. 338 S.W.3d at 74. Some church attendees who lost their membership under the new requirement objected to the amended bylaws and, similar to this case, asserted that the trustees did not follow the procedures specified for amending the bylaws and the trustees had not been properly elected. *Id.* The court of appeals concluded that the trial court lacked jurisdiction to intervene because to do so would interfere in a matter of "internal church governance and ecclesiastical concerns" involving a determination of who may be admitted or excluded from church membership. *Id.* at 77.

Dist.] 2014, pet. denied). However, "the right of a church to decide for itself whom it may admit into fellowship or who shall be expelled or excluded from its fold cannot be questioned by the courts, when no civil or property rights are involved." *Westbrook*, 231 S.W.3d at 398. Disgruntled church members cannot circumvent ecclesiastical immunity by suing church members rather than the religious body itself, else ecclesiastical immunity "would be an empty protection" and "there would be an inappropriate chilling effect on the ability of churches to discipline their members." *Id.* (quoting *Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)).

Intervenors do not cite any cases to support their argument that Texas courts may consider their claims. At the heart of this dispute is their complaint that they were not included on the approved temple membership list and that the temple did not follow its own governing procedures. We look to the substance of their claims to determine whether the dispute has ecclesiastical implications. *See Shannon*, 476 S.W.3d at 622.

**Breach of Contract.** Intervenors allege in their live petition that they had a contract with the temple because they paid their dues and submitted applications "to become members and receive voting rights." Appellants have not established that they had a contract with the temple. Under the temple bylaws, membership applications require unanimous approval of the Prabandhak Committee. Appellants did not establish that they ever received unanimous approval of the Prabandhak Committee to become members. Moreover, their breach of contract claim revolves around their complaint that they were disenfranchised from their purported membership status and right to vote.

The question of who may be admitted or excluded from a house of worship is a religious question, and we may not intervene in such disputes. *Retta*, 338 S.W.3d at

9

77; *see also Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 896 (Tex. App.—Dallas 2000, pet. denied) ("[T]he decision to revoke the [Mormon] Temple Recommend is an internal matter based on the Church's religious doctrine, and the Turners' allegations cannot be determined without an inquiry into and evaluation of the Mormon religion[, which] is prohibited under the First Amendment."); *Mangum v. Swearingen*, 565 S.W.2d 957, 959 (Tex. Civ. App.—San Antonio 1978, writ ref'd n.r.e.) (concluding, despite church's failure to comply with bylaws in expelling members who were deacons: "[w]hen a person becomes a member of a church, he thereby submits to its ecclesiastical jurisdiction in ecclesiastical matters and has no legal right to invoke the supervisory power of a civil court as long as none of his civil rights are involved"). Accordingly, despite Intervenors' labeling their claim as a breach of contract, because its resolution involves a religious question, the trial court lacked jurisdiction to address it. *See Shannon*, 476 S.W.3d at 622; *see also Williams*, 26 S.W.3d at 59 ("Whether this suit is ecclesiastical, or concerns property rights, torts, or criminal conduct, is determined by first examining the substance and effect of the . . . petition—without considering what they use as claims—to determine its ecclesiastical implication.").

**"Fraud, Collusion, and Arbitrariness."** Intervenors also contend that the Committee Members "colluded with the 'high priest' and each other to prevent Intervenors from participating in" temple elections by denying their "membership and voting rights" and removing them from the membership list. In their live petition, Intervenors alleged, "[Committee Members], through collusion, fraud and arbitrariness in conspiracy with the biased 'high priest' . . . manipulated the [trial court] and election process to remove Intervenors Harpinder Singh and Jagjit Gill from the 2012 membership list and Intervenor Baldev Singh from the 2013 membership list." Intervenors have not shown that they had membership and voting rights, and presuming they did, how that would allow the trial court to entangle itself

10

in a membership dispute. *See Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, writ denied).

The Supreme Court has left unresolved the question of whether there is room for "marginal civil court review" of the decisions of ecclesiastical tribunals under the narrow rubrics of fraud or collusion; however, it has made clear that there is no "arbitrariness" exception to the general rule that civil courts are bound to accept the decisions of ecclesiastical tribunals on religious matters.[7] *Id.* at 30-31 (citing *Milivojevich*, 426 U.S. at 713). Civil courts are barred from entertaining claims that ecclesiastical procedures were arbitrary and thus violated fundamental due process rights. *Id.* (citing *Milivojevich*, 426 U.S. at 713) ("[T]o analyze whether the ecclesiastical actions of a church judicatory are . . . 'arbitrary' . . . entail[s] inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow[, which] would undermine the general rule that religious controversies are not the proper subject of civil court inquiry.").

While the Supreme Court left open the possibility that fraud or collusion claims may serve as vehicles for civil court review of ecclesiastical decisions, we have found no Texas case that has applied such an exception. *See id.* Intervenors' complaint that they were prevented from participating in temple elections, denied membership rights, and removed from the membership list is exactly the type of ecclesiastical matter into which civil courts cannot constitutionally intervene because it would require an examination of the role of the High Priest and the Committee Members in admitting or expelling members. *See id.; see also In re Godwin*, 293 S.W.3d 742, 749-50 (Tex. App.—San Antonio 2009, orig. proceeding [mand. denied]) (holding

---

[7] Church membership is generally voluntary and restricted. *Cf. Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 177 (Tex. App.—Dallas 2000, pet. denied) (noting membership in social clubs is voluntary and restricted). It is not a property right that would authorize judicial intervention in a membership dispute. *See id.*

fraud claim alleging that pastor and church used funds for improper purposes concerned an ecclesiastical matter because it "require[d] an examination of the church's view of the role of pastor, staff, and church leaders, their authority and compensation, and church management") *Greanias v. Isaiah*, No. 01-04-00786-CV, 2006 WL 1550009, at *8-9 (Tex. App.—Houston [1st Dist.] June 8, 2006, no pet.) (mem. op.) (holding controversy over removal of church parish council members purportedly in violation of local bylaws were "ecclesiastical matters that the First Amendment forbids courts to adjudicate"). Therefore, we conclude the trial court lacked jurisdiction over those claims and thus did not err in granting summary judgment.[8] *See Retta*, 338 S.W.3d at 77. We overrule Intervenors' first issue.

## II. No Jurisdiction to Interfere with Internal Church Governance Matters

In their second and third issues, raised for the first time on appeal, Intervenors complain of the trial court's rulings ordering an election, declaring one election was "valid and controlling," and appointing the High Priest to determine who would be included on the membership list.[9] Intervenors contend that if the trial court lacked

---

[8] Intervenors further argue that the trial court erred in rendering summary judgment because (1) Intervenors amended their petition after the motion was filed and the final judgment does not address all of Intervenors' claims; and (2) as to their breach of contract claim, Intervenors' purported contracts are with the temple and the temple did not move for summary judgment. However, in concluding that it lacked subject matter jurisdiction, the trial court was not limited to the grounds raised in the summary judgment motion. *See Dallas Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 40–41 (Tex. 2013) (holding court of appeals erred in concluding that its review of trial court's jurisdictional ruling was limited to the grounds stated in plea to the jurisdiction); *DeWolf v. Kohler*, 452 S.W.3d 373, 382 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A court is obliged to determine whether it has subject-matter jurisdiction and must consider the question sua sponte even if it is not challenged by a party."). Intervenors' claims all revolve around their complaint that they were omitted from the approved membership list, which is a jurisdictional issue.

[9] Our record on appeal does not reflect that when the trial court made these rulings, any party had suggested that the court lacked jurisdiction under the ecclesiastical abstention doctrine. But challenges to subject matter jurisdiction may be raised for the first time on appeal, and we are obliged to ascertain whether subject matter jurisdiction exists even when the parties do not question it. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 306 (Tex. 2010).

jurisdiction over their claims, it also lacked jurisdiction to intervene in the Prabanhak Committee member selection process and determine who had the authority to admit or exclude members of the temple. Committee Members contend that the trial judge properly deferred to the High Priest, but do not address the court's other rulings intervening in the election process. Committee Members contend the trial judge stated, "I'm willing to enforce the bylaws because that's a matter of contract. I'm not willing to tell the organization who can or who can't be members."[10] We acknowledge that the differences between ecclesiastical and non-ecclesiastical issues are not always distinct. *See Masters*on, 422 S.W.3d at 606. However, whether the trial court's orders were limited to determining contractual rights, if any, under the bylaws or otherwise, as noted above, no case has been cited that stands for the proposition that trial courts have jurisdiction based solely on the fact that a breach of contract claim has been alleged. We conclude that the trial court's actions interfered with internal church governance matters over which the trial court lacked jurisdiction.

The temple's alleged failure to follow its bylaws on a matter of internal governance involves ecclesiastical concerns, and civil courts may not interfere in these matters when disposition of church property is not at stake. *Compare Retta*, 338 S.W.3d at 77, *with Masterson*, 422 S.W.3d at 608 (holding trial court had jurisdiction to interpret church's corporate bylaws when disposition of church property was at stake after a church schism).[11] Therefore, the trial court did not have jurisdiction to

---

[10] A partial transcript of this hearing was attached as an exhibit to Committee Members' motion for summary judgment.

[11] In *Masterson*, the supreme court held that "Texas courts should use the neutral principles methodology to determine property interests when religious organizations are involved." 422 S.W.3d at 607. The court addressed specifically "what happens to the property when a majority of the membership of a local church votes to withdraw from the larger religious body of which it has been a part." *Id*. at 596. Individuals had purchased real property and donated it to the Northwest Texas Episcopal Board of Trustees (Trustees) to establish a mission church. *Id*. at 597. The Episcopal Diocese of Northwest Texas (Diocese) approved an application to organize a mission church that was then built on the property, and more real estate was donated to the Trustees for the

order an election or choose which election was "valid and controlling" based on a certain membership list. *See Retta*, 338 S.W.3d at 77; *see also Fesseha v. Ethiopian Orthodox Tewahedo Debre Meheret St. Michael's Church in Dallas*, No. 05-10-00202-CV, 2011 WL 2685969, at *3 (Tex. App.—Dallas July 12, 2011, no pet.) (mem. op.) (holding trial court could not intervene in dispute when trustees allegedly failed to comply with bylaws, disenfranchised members, refused to allow those members to participate in meetings, refused to provide them copies of church documents, and established a mandatory monthly membership fee). The determination of who has the authority to admit or exclude members is similarly an ecclesiastical matter to be resolved within the temple hierarchy.[12] *Cf. Cherry Valley*

---

church. *Id*. Eventually, the church became incorporated. *Id*. The corporation's bylaws prescribed qualifications for voting and specified that amendments to bylaws would be by majority vote. *Id*. Due to doctrinal differences, some church members proposed organizing as an independent church, and there was a vote to dissociate from the Diocese. *Id*. at 597-98. The Diocese and others filed suit seeking, in a nutshell, control of the real property. *Id*. at 598.

The court established that "courts are to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved" but still must defer to decisions of appropriate ecclesiastical decision makers on questions "of an ecclesiastical or inherently religious nature." *Id*. at 605-06. The court concluded that the question involving who were the true and proper representatives of the church was an ecclesiastical matter of church governance, but questions regarding who was entitled to the church property and, relatedly, whether the corporate bylaws were complied with when the vote occurred to dissociate from the Diocese could be decided on the basis of neutral principles because they involved the proper disposition of real property. *Id*. at 608.

After deciding *Masterson*, the supreme court subsequently reaffirmed that

[C]ourts applying the neutral principles methodology defer to religious entities' decisions on ecclesiastical and church polity issues *such as who may be members of the entities* and whether to remove a bishop or pastor, while they decide non-ecclesiastical issues such as property ownership and whether trusts exist based on the same neutral principles of secular law that apply to other entities.

*Episcopal Diocese of Fort Worth*, 422 S.W.3d at 650 (emphasis added). The parties have not established that their dispute involves "non-ecclesiastical issues such as property ownership and whether trusts exist." *See id*.

[12] We acknowledge that trial courts may intervene in church elections when the disposition of church property is at stake. *See, e.g., Jones v. Wolf*, 443 U.S. 595, 602 (1979) ("The only question presented by this case is which faction of the formerly united . . . congregation is entitled

14

*Church of Christ/Clemons v. Foster*, No. 05-00-01798-CV, 2002 WL 10545, at *4 (Tex. App.—Dallas Jan. 4, 2002, no pet.) (noting when identity of the highest authority in a church is undisputed, trial court can defer to that authority's decision on religious matters "without delving into a constitutionally prohibited determination of the intricacies, shades, and nuances of ecclesiastical affairs or church governance").

The Committee Members argue, however, that the trial court merely deferred the dispute to the High Priest, as the temple's highest authority. *See Masterson*, 422 S.W.3d at 607 ("Civil courts are constitutionally required to accept as binding the decision of the highest authority of a hierarchical religious organization to which a dispute regarding internal government has been submitted."). We disagree. The trial court reconstituted the prior Prabanhak Committee, ordered a new election, and chose which of two elections was "valid and controlling." Thus, assuming for argument's sake that the High Priest is the highest authority—a fact that the parties dispute—the trial court nevertheless entangled itself in the inner workings of the Prabanhak Committee selection process. These were internal church governance matters involving membership in the temple and the selection of Committee Members into which the trial court should not have intervened. *See Retta*, 338 S.W.3d at 77. Because the trial court lacked jurisdiction to reconstitute a prior committee, order an

---

to possess and enjoy the [church] property . . . . There can be little doubt about the general authority of civil courts to resolve this question."); *Bouldin v. Alexander*, 82 U.S. 131, 137, 139-40 (1872) (acknowledging that courts "cannot decide who ought to be members of the church" but holding that they could address validity of attempt to oust trustees who held legal title to church property in trust and a large number of church members because issue involved "legal ownership of the property"); *Watson*, 80 U.S. at 719-21 (1871) (involving dispute over possession, control, and use of church property by improperly elected trustees); *Masterson*, 422 S.W.3d at 596 (addressing "what happens to [church] property when a majority of the membership of a local church votes to withdraw from the larger religious body of which it has been a part"). However, we have found no precedent that would allow a trial court to reconstitute a committee, order an election, decide which election is "valid and controlling," and appoint someone in the church to resolve church disputes, especially when, as here, the bylaws provide a mechanism for referring disputes to a higher authority, the Akal Takht. Such decisions must be left to internal church governance.

election, and determine the "valid and controlling" election, we sustain Intervenors' second and third issues.

## *Conclusion*

Because the trial court lacked jurisdiction over the parties' dispute, its judgment and actions are void. *See Dean v. Alford*, 994 S.W.2d 392, 394 (Tex. App.—Fort Worth 1999, no pet.). Accordingly, we vacate the trial court's judgment and dismiss the case for lack of subject matter jurisdiction.[13] *See Anderson v. Truelove*, 446 S.W.3d 87, 94 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

/s/    Martha Hill Jamison
        Justice

Panel consists of Justices Jamison, Donovan, and Brown.

---

[13] While we are cognizant that this dismissal leaves the parties without a judicial determination of whether the previously held elections were properly conducted, our decision is in accordance with the case law proscribing courts from intervening in internal governance and membership disputes. *See Dean*, 994 S.W.2d at 396.

16